## UNITED STATES v. 62 PACKAGES, MORE OR LESS, OF MARMOLA PRESCRIPTION TABLETS.
### No. 139.

District Court, W. D. Wisconsin.

Feb. 23, 1943.

John J. Boyle, U. S. Atty., and Alvin M. Loverud, Asst. U. S. Atty., both of Madison, Wis., and Daniel P. Willis, Senior Atty., Federal Security Agency, of Washington, D. C., for libelant.

William H. Dougherty, Paul N. Grubb, and Stanley M. Ryan, all of Janesville, Wis., and Rockwell T. Gust and David A. Howell, both of Detroit, Mich., for Raladam Co., intervening claimant.

STONE, District Judge.

This is a libel for condemnation, under the provisions of the Federal Food, Drug and Cosmetic Act of June 25, 1938, c. 675, 52 Stat. 1040, Title 21 U.S.C.A. § 301 et seq., of 62 packages of Marmola Prescription Tablets which had been transported in interstate commerce from Detroit, Michigan, to La Crosse, Wisconsin, by the intervener, the Raladam Company. The libel charges that the Marmola Tablets under seizure were misbranded within the meaning of Section 502(j) of said Act, 21 U.S.C.A. § 352(j), in that the article is dangerous to health when used in the dosage or with the frequency prescribed, recommended or suggested in the labeling thereof, and within the meaning of Sections 502(a) and 201(n)

of said Act, 21 U.S.C.A. § 352(a) and 321 (n), in that the labeling is false and misleading because it fails to reveal facts material with respect to consequences which may result from the use of the article under the conditions of use prescribed therein.

The Raladam Company intervened in this action as claimant of the seized article, and answered denying the allegations in the libel, and alleged that Sections 201(n) and 502(a) of said Act, 21 U.S.C.A. § 321(n) and 352(a), were not in force at the time of the alleged violation; that the Federal Food, Drug and Cosmetic Act and each section thereof relied upon by the Government in these proceedings, is unconstitutional for the reasons (a) it provides for unlawful search and seizure; (b) it is too indefinite and uncertain in its provisions; and (c) that said sections contemplate or constitute an unlawful delegation of legislative powers, all in violation of Articles I, II and III of the Constitution of the United States.

The parties stipulated that the tablets seized had been transferred in interstate commerce; that the Marmola Prescription Tablets contained the following ingredients:

| | |
|---|---|
| 1 grain | Extract Bladderwrack |
| 1/2 grain | Extract Phytolacca |
| 1/4 grain | Extract Cascara Sagrada Rx. 87 Spec. |
| 1/2 grain | Desiccated Thyroid |
| 16/1000 min. | Oleoresin Ginger |
| | Po. Saccharum special |
| 3 grains | Calcium Carbonate Precipitated |
| 1/24 min. | Methyl Salicylate |
| 1/24 min. | Oil Anise |
| 1/24 min. | Oil Sassafras |
| | Talc Brown |
| | Ivory Black |
| | Aqua for Extracts |
| | Po. Burnt Umber |
| | Red Oxide of Iron |
| | Syrupus Simplex |
| | Lubricating Solution |
| | Aqua for Granulating |
| | Liquid Petroleum colorless. |

They further stipulated as follows:

"4. These tablets were manufactured for the Raladam Company by the Arner Company, Inc., from ingredients furnished by Parke, Davis & Company and Parke, Davis & Company has either supplied the active ingredients for or actually manufactured Marmola Prescription Tablets for more than twenty (20) years preceding the commencement of these proceedings, during which period over Twenty Million (20,-000,000) packages have been sold by the Raladam Company.

"5. During the past twenty (20) years no change has been made in the ingredients or in the amounts thereof used in Marmola Prescription Tablets except that during the last World War when Cascara Sagrada was temporarily unavailable 1/4 grain phenolphthalein was temporarily substituted for the 1/4 grain of Cascara Sagrada in the Marmola formula.

"6. The 1/2 grain of Desiccated Thyroid contained in each Marmola Prescription Tablet is and was at all times during the last twenty (20) years a product of Parke, Davis & Company, and during all of said time all Desiccated Thyroid manufactured and sold by Parke, Davis & Company, which amounts to many millions of grains annually, has contained approximately fifty per cent (50%) more Organic Iodine than the mean average for Desiccated Thyroid as specified in the United States Pharmacopoeia.

"7. The only ingredient of Marmola Prescription Tablets that is involved in this action is the 1/2 grain of Desiccated Thyroid contained in each tablet."

The following provisions of the Federal Food, Drug and Cosmetic Act are involved in these proceedings:

Section 201, 52 Stat. 1040, 21 U.S.C.A. § 321:

"(g) The term 'drug' means (1) articles recognized in the official United States Pharmacopoeia, official Homœopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; and (2) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (3) articles (other than food) intended to affect the structure or any function of the body of man or other animals; and (4) articles intended for use as a component of any article specified in clause (1), (2), or (3); but does not include devices or their components, parts, or accessories."

"(n) If an article is alleged to be misbranded because the labeling is misleading, then in determining whether the labeling is misleading there shall be taken into account (among other things) not only representations made or suggested by state-

ment, word, design, device, or any combination thereof, but also the extent to which the labeling fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use of the article to which the labeling relates under the conditions of use prescribed in the labeling thereof or under such conditions of use as are customary or usual."

Section 304 of the Act, 21 U.S.C.A. § 334, which pertains to the method of seizure and disposition of misbranded food and drugs moving in interstate commerce; and Section 502, 21 U.S.C.A. § 352, which reads in part as follows:

"A drug or device shall be deemed to be misbranded—

"(a) If its labeling is false or misleading in any particular.

\*　　\*　　\*　　\*　　\*

"(j) If it is dangerous to health when used in the dosage, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof."

Section 902 of the Act, 21 U.S.C.A. § 392 note, provides for the effective date of the Act, and reads in part: "\* \* \* That sections 502(j), 505, and 601(a), \* \* \* and all other provisions of this Act to the extent that they may relate to the enforcement of such sections, shall take effect on the date of the enactment of this Act \* \* \*" which was June 25, 1938.

Section 201(b), 21 U.S.C.A. § 321(b), defines interstate commerce as follows: "The term 'interstate commerce' means (1) commerce between any State or Territory and any place outside thereof \* \* \*."

The labeling involved consists of the printed matter found on the box containing the Marmola Prescription Tablets and in the booklet accompanying same. The portions that are material to the disposition of the issues herein are as follows:

(On Box)

"Directions

"Take one tablet before each meal and at bedtime with enough water to swallow easily or as directed by a physician. Marmola is recommended *only* as a treatment for adult fat persons whose excess fatness is caused by hypothyroidism with accompanying subnormal metabolic rates but who are otherwise normal and healthy. Marmola *should not be taken by persons suffering from any abnormal condition except abnormal excess fat caused as above stated. We*

make no diagnosis as that is the function of your physician who must be consulted for that purpose. Marmola is not recommended for children. *Before taking be sure to read enclosed circular."*

(In Booklet)

"The Purpose of Marmola

"*Marmola* prescription tablets have been sold to the public for more than thirty years and more than twenty million boxes have been distributed during that period. *Marmola* is not sold as a cure-all. It is intended for use only by obese (Obesity is the term used by the medical profession for an excessive development of fat throughout the body) persons who are otherwise normal and healthy and whose obesity is caused by hypothyroidism with accompanying subnormal metabolism, and our statements and representations made herein or otherwise are strictly limited to this treatment under these conditions and according to the dosage as recommended. We do not make any diagnosis as that is the function of your physician, who must be consulted for that purpose. *Marmola* should not be taken by persons suffering from any abnormal condition except obesity (abnormal excess fat) caused as above stated. The complete formula will be found on page 25. Purchasers who decide or are advised they do not need *Marmola* may obtain refund of the purchase price of any unused package by returning it to the Raladam Company at Detroit.

"Important Directions

"*First.* Take one *Marmola* tablet before each meal and one at bedtime—four a day. Do this regularly.

"*Second.* For best results we recommend that *Marmola* be used as directed over a period of sixty to ninety days—if needed that long.

"Marmola is intended to be used as a week-by-week treatment. The dosage is *not intended to cause rapid reduction of weight.* Most authorities advise a moderate rate of reduction so the body and skin may adapt themselves to the changed conditions.

"The rate of reduction differs with individuals. Habits also affect it. To some results appear rapid, to others slow. No food, drug or other substance which has any physiological effect may be taken internally or applied externally without the possibility of unpleasant or harmful results in some persons if they happen to be constituted so that they do not tolerate the

food or other substance. Such a condition can not always be predicted either by physicians or others. If any unpleasant effects are experienced stop taking *Marmola* until they disappear, then resume taking one-half of the former dosage or consult a physician.

### "How Quick?

"Fat reduction under the *Marmola* treatment does not usually start at once. It may take a few days—even up to two weeks—to get things started in the right direction. But the start, when it comes, means much, and it sometimes comes with a spurt. The chief purpose of *Marmola* is to aid in the correction of a deficiency in those obese persons who are otherwise normal and healthy and in whom the lack of the substance supplied by *Marmola* causes the accumulation of excess abnormal fat. The first dose of *Marmola* starts a new supply of this factor but slowly, so it takes a little time to become apparent. Do not be impatient.

### "Diet and Exercise

"The makers of *Marmola* do not advise abnormal exercise or diet. Extreme measures should not be undertaken. Abnormal exercise in an obese condition may overtax the heart. Starvation diets may lead to a deficiency in vitamins and minerals.

"But there is no question that reasonable habits in these respects greatly aid results. Do not throw too great a burden on *Marmola*.

"Normal activity, like walking, is suggested but not anything too strenuous without an examination. Moderation in the use of fat-forming foods will aid what you are seeking. But exercise and diet alone cannot be relied upon where there is a deficiency which causes too much food to go to fat. *Marmola* supplies a factor needed in the correction of this deficiency, where the lack of the substance it supplies has caused the accumulation of the abnormal excess fat.

### "Suggestions

"Avoid starches and sweets in excess. Starchy foods include bread and potatoes. Cut down fatty foods. Instead of them, eat poultry, eggs, lean meat, clear soups, fish and sea foods. All kinds of fruits and fresh vegetables are good for you. Eat all you want of them. But be sparing of foods with high calory content, like sugar, cereals, and fat. We do not recommend any great self-denial, but simply a

reduction of work which *Marmola* is intended to do.

"Moderate exercise helps to keep you healthy. Walking is a good exercise. Deep breathing in the open air is good for you, for it supplies oxygen to the blood.

"Chew all foods well. At every meal eat a little less than you think you need. These things are suggested to hasten the results you seek, by giving *Marmola* something less to do.

"In the 30 years of *Marmola,* it is quite natural that many people who have heard about it, but not used it, may have developed wrong ideas. That is why the complete formula is published in this little book.

"The idea that excess fat is always due solely to laziness or gluttony has been dissipated by science. One may be active and eat moderately and still grow fat, if a deficiency exists which causes too much food to be converted into fat instead of energy.

"*Marmola* is a time-tested aid to correct this basic cause of the abnormal excessive fat accumulated by reason of the deficiency it is designed to correct. There is no claim to quick and amazing results. A mere hot bath might bring greater quick results by simply draining so much water from the system. But such loss in weight is temporary and unimportant. *Marmola* aims at the basic cause and supplies a deficiency and thus brings real results whenever this deficiency exists. The *Marmola* prescription is compounded by a famous medical laboratory and every ingredient and every percentage has been tested by years of experience.

"*   *   *

### "When to Stop

"Stop *Marmola* when your weight comes down to normal. A table in this booklet tells you the average weight of persons of your height and age. Your ideal weight may be either more or less than the average. But you are the best judge of the weight at which you feel the best and are most efficient. Stop taking *Marmola* as soon as you lose your abnormal excess weight. If, later, you should start to gain again take more *Marmola* tablets until conditions are corrected.

"The time required differs with conditions. The use of *Marmola* by those who need it normally results in greater energy and vitality. Our medical advisers do not recommend the taking of *Marmola* as a tonic after the excess fat is gone. This

might lead to becoming too thin. Nor should it be taken if any condition arises which inhibits its use. Consult your physician if any unusal circumstances or conditions arise.

"* * * Consult your physician if you want special advice in any unusual condition. We do not make any diagnosis, as that requires personal contact. If you want advice in any special condition or desire more advice than we give you in this book, get it from a physician. We do not prescribe in special cases by letter.

"Your doctor, of course, is opposed to self-medication. He may prefer to write his own prescription for some special case, but the *Marmola* prescription has been developed by over 30 years of experience and its efficiency has been tested by the sale of over 20,000,000 boxes throughout the world."

This case was ably tried by counsel for both parties. Testimony of experts, specialists and investigators, highly qualified in their particular branches of medicine, was submitted by both parties. Voluminous evidence was presented, which included testimony relating to internal medicine, nutrition, chemistry, obesity, endocrinology, thyroid diseases, metabolism, tuberculosis, diabetes, heart diseases, nervous disorders, and many other diseases of the human body. The Government's witnesses included eminent specialists in endocrinology, obesity and thyroid diseases, among whom were Dr. James Short of New York City, a specialist in internal medicine; Dr. Frank Stites of Louisville, Kentucky, a specialist in internal medicine; Dr. Elmer L. Sevringhaus of Madison, Wisconsin, a professor in the medical school of the University of Wisconsin and a specialist in metabolic and endocrine diseases; Dr. Willard O. Thompson, Chicago, professor in the medical school of the University of Chicago and a specialist in endocrinology and metabolism; Dr. Louis H. Newburgh of Ann Arbor, Michigan, a professor in the medical school of Michigan University and a specialist in endocrinology and metabolic diseases; Dr. Israel Bran of Philadelphia, Pennsylvania, a specialist in thyroid diseases. Two members of the staff of Mayo Clinic, Rochester, Minnesota, testified on behalf of the Government. One, Dr. Russell M. Wilder, an instructor in the medical school of the University of Minnesota, is a specialist in the treatment of diabetes; the other, Dr.

Samuel F. Haines, is the head of the section of the clinic pertaining to thyroid diseases, and is also an associate professor at the University of Minnesota.

Other Government witnesses were Dr. William Oatway, Madison, Wisconsin, member of the faculty of the medical school of the University of Wisconsin, and on the staff of the Wisconsin General Hospital in charge of the thoracic service, including tuberculosis; Dr. Chester M. Kurtz of Milwaukee, Wisconsin, also a member of the faculty of the medical school of the University of Wisconsin, and a specialist in heart diseases; Dr. Anton J. Carlson, Chicago, eminent physiologist who had a professorship in the department of physiology at Rush Medical College and the University of Chicago from 1904 until recently when he retired; and Dr. Marian S. Kimble of Madison, a chemist who, as an investigator, made tests as to the value of desiccated thyroid as a remedy for obesity.

Among those testifying for the intervener were Dr. Abbott W. Allen of New York, assistant clinical professor of medicine of Columbia University; Dr. John A. Killian of Englewood, New Jersey, a biochemist, former instructor of physiology and physiological chemistry at the medical school of Fordham University and now professor of biochemistry at the New York Post-Graduate School of Columbia University; Dr. Plinn T. Morse of Detroit, Michigan, former instructor in pathology of the University of Michigan and the Detroit College of Medicine, and at present consulting pathologist in Detroit; Dr. William A. Spitzley of Detroit, a general practitioner of wide experience; Dr. Benjamin H. Schlomovitz of Milwaukee, Wisconsin, professor of pharmacology and toxicology at Marquette University Medical School, and a consulting pathologist; and Dr. Andrew I. Rosenberger of Milwaukee, Wisconsin, a specialist in diseases of the nervous system.

The principal questions before the Court are:

First: Is the Federal Food, Drug and Cosmetic Act unconstitutional?

Second: Is the Marmola tablet dangerous to health when used in the dosage or with the frequency and duration prescribed, recommended or suggested in the labeling thereof?

Third: Is the Marmola labeling false and misleading in the representation that Marmola is a safe remedy for obesity?

Fourth: Does the labeling reveal facts material with respect to consequences which may result from the use of Marmola under the conditions of use prescribed in the labeling?

Intervener asserts that the act, and particularly the sections thereof under which these proceedings are brought, are unconstitutional and void because (1) they permit an unlawful search and seizure in violation of the Fourth Amendment to the Constitution of the United States; (2) that the statute and the said sections thereof violate the Fifth Amendment to the Constitution in that they are too indefinite and uncertain to apprise intervener of the offenses attempted to be defined therein; (3) that the statute constitutes an unlawful delegation of legislative powers in violation of Articles I, II, and III of the Constitution of the United States.

■ The statute, like its predecessor, was designed to regulate commerce in food, drugs and cosmetics, and to protect the public against foods and drugs that are dangerous to health, as well as those that are falsely branded. It permits the administrative agencies of the Government, charged with its enforcement, to continue to function as under the former act. It is well settled that Congress has the power, under the commerce clause of the Federal Constitution, to condemn the interstate transportation of misbranded drugs, and to make such articles contraband when so transported. McDermott v. Wisconsin, 228 U.S. 115, 33 S.Ct. 431, 57 L.Ed. 754, 47 L.R.A.,N.S., 984, Ann.Cas.1915A, 39; Hipolite Egg Co. v. United States, 220 U.S. 45, 31 S.Ct. 364, 55 L.Ed. 364.

■ The Fourth Amendment to the United States Constitution does not apply to a seizure process in civil actions. The sections of the act here in question do not provide for unreasonable searches and seizure. This is a civil action as distinguished from a criminal action. It is a proceeding in rem and need not be supported by an affidavit of probable cause. United States v. Geo. Spraul & Co., 6 Cir., 185 F. 405; United States v. Two Barrels of Desiccated Eggs, D.C., 185 F. 302, 303.

■ Section 502(j), 21 U.S.C.A. 352(j), declares a drug to be misbranded if it is dangerous to health when used in the dosage or with the frequency prescribed in the labeling thereof. The words "danger-ous to health" provide a question of fact for determination by the Court or jury and leave nothing for speculation.

■ Section 502(a), 21 U.S.C.A. 352(a), declares a drug to be misbranded if its labeling is false or misleading in any particular. Section 201(n), 21 U.S.C.A. 321 (n), defines the scope of Section 502(a). There is nothing indefinite or ambiguous in Sections 201(n) or 502(a).

■■ Proofs under the statute are limited to material facts omitted from the labeling with respect to consequences that may result from the use of the article. The word "may" is here used in its ordinary sense and signification, there being nothing to show the intention of Congress to affix any other meaning to it. By Section 201(n) the Government is restricted in its proof to material facts with respect to the consequences that may follow the use of the article; hence there can be no deprivation of intervener's property without due process of law.

■ In the act there is no unlawful delegation of legislative power by Congress, nor do the acts of the Government pursuant to the provisions of the statute constitute an exercise of legislative power in violation of the Constitution. Congress may vest discretion in executive officers of the Government to promulgate regulations interpreting the statute even to the extent of providing for penalizing one for a breach of such regulations. United States v. Grimaud, 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563; Union Bridge Co. v. United States, 204 U.S. 364, 27 S.Ct. 367, 51 L.Ed. 523; Hampton, Jr., & Co. v. United States, 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624.

In the statute Congress has set up its own policies and standards. There is no delegation of legislative powers to executive officers of the Government. No executive regulations with the force and effect of law are here involved. The statute and the sections thereof involved in these proceedings are well within the powers of Congress to enact and do not violate any part of the United States Constitution or its amendments.

The Marmola tablets which are offered to the public as a treatment for obesity contain a number of ingredients, but the only one involved in this action is the ½ grain of desiccated thyroid contained in each tablet, and which contains 0.3% organic iodine, which is about 50% more organic iodine

than is contained in desiccated thyroid prepared according to the standards of the U. S. Pharmacopoeia. One-third to one-half of the organic iodine in desiccated thyroid consists of thyroxin, which is the active principle of the thyroid hormone secreted by the thyroid gland. The potency of desiccated thyroid is proportional to its organic iodine content, consequently the Marmola tablet produces a greater physiological effect than the same amount of desiccated thyroid prepared according to the standards of the United States Pharmacopoeia.

The labeling represents that Marmola is intended as a cure for obesity and is for use only by obese persons who are otherwise normal and healthy and whose obesity is caused by hypothyroidism with accompanying subnormal metabolism; that hypothyroidism is the basic cause of obesity which results from a lack of a substance which Marmola supplies. The daily dosage recommended is equivalent to two grains of desiccated thyroid containing 0.3% organic iodine, or to three grains of desiccated thyroid containing 0.2% organic iodine, prepared according to the standard of the United States Pharmacopoeia.

Obesity is defined as an excessive development or excessive storage of fat throughout the body. There is a difference of opinion among the experts who testified as to the cause of obesity and its remedy. Some of the Government witnesses testified that overweight is caused by excessive eating and lack of proper exercise; that the weight may be reduced by dietary measures coupled with adequate exercise. Some of claimant's witnesses testified that a large proportion of cases of obesity are caused by endocrine disturbances or disorders; that the thyroid gland is the regulator of the metabolic processes and that obesity is due at least in a large part to a deficient activity in this gland, and hence in its treatment thyroid medication is necessary. Other witnesses were of the opinion that obesity is caused both by overeating and by endocrine disturbance.

Hypothyroidism is a word which denotes the underfunctioning of the thyroid gland, which is a condition of disease. It is accompanied by a subnormal basal metabolic rate and by other symptoms, such as dryness of skin, scarcity of hair and eyebrows, sluggishness of physical and mental reactions, decreased appetite, slower pulse rate and characteristic changes in the composition of the blood, and, in advanced stages of hypothyroidism or myxedema, by puffy and swollen appearance of the face and other parts of the body due to a collection of mucoid fluid beneath the skin.

By metabolism is meant the total of the various processes by which food is transformed in the body into the chemicals which are absorbed into the blood stream and lymphatic system for the purpose of nourishing the body so that it can carry on its work. The health of the body depends upon the well-balanced use of the body chemicals. Metabolism denotes all the processes of the body by which food is used, body heat and energy created, and the body built up or repaired, and by which the tissues of the body are destroyed and waste matter excreted.

The rate of metabolism is measured by the rate at which the body produces or gives off heat. The "basal metabolic rate" is defined as the least rate of chemical activity which will maintain the absolutely essential functions of the body sufficiently to keep an individual alive. Every activity of the body increases the amount of energy consumed. Having found the basal requirements of an individual, the physician can, by the addition of the demands of the individual's other activities, compute what his total needs will be. Average normal standard rates have been established by tests, and the results are expressed in terms of either plus or minus variations from the standard. In the same classification normal healthy people vary one from another in the normal basal metabolic rate. The great majority vary only to the extent of 10% more or 10% less in the amount of heat produced, represented by the average normal standard. Normal healthy people may vary from the average standard normal rate to even a greater extent, but seldom more than 15% more or less than standard, which means that the individual is consuming 15% more or 15% less energy than the average among normal people.

Desiccated thyroid is used in the treatment of hypothyroidism, and the optimum dosage in such treatment must be determined for each individual case. It varies with each individual and is established only by trial and error. The optimum daily dosage may be as little as ¼ grain per day, and in most cases less than 2 grains per day, although there are some cases that exceed 2 grains per day, depending upon the underfunctioning of the individual's thyroid gland.

There was a substantial agreement among the medical witnesses that the overdosage of desiccated thyroid results in an increase in the metabolism of the patient; that it has a toxic effect on people that are hypothyroid in that it increases their basal metabolic rate and injuriously affects the functioning of the endocrine glands, kidney and liver, impairing their capacity for normal functioning; that it places an extra burden on the organs of the body; that it results in symptoms which cannot be distinguished from those disclosed in spontaneous hyperthyroidism, such as rapid heart, heart pains, shortness of breath, sleeplessness, nervous and emotional instability, headaches, dizziness, tremor, muscular weakness, disturbances of the alimentary canal, fatigue, nausea, and, in women, menstrual disturbances; that the symptoms of hyperthyroidism will disappear days or weeks after the discontinuance of desiccated thyroid, but it sometimes results in the precipitation of a more serious and permanent disease and injury to health; that many people who consider themselves normal and healthy, and who are completely unaware that they are suffering from any hidden disease, have been found to have physical impairments or diseases in a mild or incipient form such as impairment of the heart, diabetes, or tuberculosis, which may be discovered only by a thorough examination by an experienced physician; that in such cases a dosage of two grains of desiccated thyroid a day aggravates the disease or ailment or accelerates the onset of their more serious phases. This fact was established by the testimony of experts and investigators learned in endocrinology and familiar with the physiological manifestations of thyroid, based on their study, experience, and clinical observations. Dr. Short testified that many people have heart ailment and are completely unaware of it; that he made a study of 2400 male persons who were supposedly healthy, which he placed in three groups. The first group included those who had normal hearts according to the electrocardiogram. There were 811 in this group. Group 2 included 1330 persons who had borderline impairments that might or might not be significant of heart disease. Group 3 included 250 persons who had a very definite impairment of the heart. In group 2, 90% had no symptoms and were unaware of any possible heart ailment. In group 3, those having definite impairment, 87% had no symptoms and were unaware of heart injury.

Dr. Russell M. Wilder testified that many people have diabetes and are unaware of it; that the records of the Mayo Clinic for the year just preceding the date of his appearance as a witness herein, showed that of approximately 100,000 patients received at the clinic, about 1700 were suffering from diabetes; that about $\frac{1}{5}$ of the 1700 came to the Clinic without any knowledge that they had this disease; that desiccated thyroid is definitely harmful to a diabetic; that when a person develops hyperthyroidism, his diabetes is invariably aggravated.

Dr. Oatway testified that many people have tuberculosis and are unaware of it; that from his investigations and tests he discovered that $\frac{9}{10}$ of those suffering from active tuberculosis were ·unaware of it.

The medical testimony was substantially all to the effect that in sound medical practice a doctor will prescribe thyroid for hypothyroidism only after a careful physical examination is made of the patient's head, eyes, throat, chest, lungs, heart, abdomen, and reflexes covering the nervous system of the patient to ascertain if the patient is suffering from any latent or underlying disease of which he is unaware, such as diabetes, tuberculosis, or heart ailment. In some instances a basal metabolism is done, X-rays of the chest are made, and an electrocardiogram of the heart is obtained.

Any drug, which for safety in its use requires diagnosis and evaluation, and when taken in the dosage and with the frequency recommended and suggested in its labeling, may expose the users to disease and pain, is dangerous to health. Marmola is such a drug. In it there is an inherent and potential danger that may reasonably be expected to attend its use when one considers that it will be used by the strong, the weak, the old, the young, the well, and the sick, without first having a physical examination or a diagnosis of their condition by a competent physician.

Obesity is not caused by hypothyroidism. Those suffering from hypothyroidism are sometimes over-weight due to the deposit in the body of a mucoid substance which is not fat and which desiccated thyroid may remove under proper treatment. Desiccated thyroid may stimulate the appetite and its use may result in increased weight unless the dosage is so large as to result in hyperthyroidism, which is a disease.

Obesity is not affected materially· by the use of Marmola prescription tablets as prescribed or by desiccated thyroid of comparable daily dosages, except by producing and

maintaining a condition of hyperthyroidism. The discontinuance of Marmola on the appearance of unpleasant effects or unusual circumstances or conditions does not avoid danger. When these effects or conditions appear, the user is in a state of hyperthyroidism, which, in some cases, may result in the precipitation of more serious and permanent injury.

The substantial portion of the public, after reading the labeling in question, would conclude that obesity is caused by the lack of some substance in the human body that Marmola supplies; that Marmola is a safe and efficient remedy for obesity, which is not a fact. The labeling fails to inform the prospective user that if he is suffering from hypothyroidism, he is not healthy and normal. It places a duty upon the user to make a self-diagnosis to determine if he is suffering from hypothyroidism. The layman lacks familiarity with medical terminology. He has little or no knowledge of medical science, and does not possess that skill and learning required to determine whether he is suffering from hypothyroidism. The labeling does not recommend that an obese person considering the use of Marmola should first consult a physician. It does advise that he consult a physician if he desires special advice in any unusual condition or more advice than appears on the label. It suggests that the doctor is opposed to self-medication and might prefer to write his own prescription.

The Federal Food, Drug and Cosmetic Act was not made for experts, nor is it intended to prevent self-medication. The purpose of the law is to protect the public, the vast multitude which includes the ignorant, the unthinking, and the credulous who, when making a purchase, do not stop to analyze. It was enacted to make self-medication safer and more effective, and to require that drugs moving in interstate commerce be properly labeled so that their use as prescribed may not be dangerous to the health of the user. It should receive a liberal construction. United States v. Lee, 7 Cir., 131 F.2d 464; Florence Mfg. Co. v. J. C. Dowd & Co., 2 Cir., 178 F. 73; Aronberg v. Federal Trade Commission, 7 Cir., 132 F.2d 165.

The administration of thyroid tablets in Marmola dosages is a dangerous procedure, and should not be undertaken without a thorough examination of the prospective user by a competent physician, and then only under the supervision of the doctor.

The Court is thoroughly convinced, by a preponderance of the evidence, that Marmola, when used as prescribed in the labeling thereof, is neither a safe, appropriate, nor an efficient remedy for obesity; that it is dangerous to the health of the user when used in the dosage or with the frequency and duration prescribed, recommended or suggested in the labeling thereof; that the packages of Marmola in question, when seized in these proceedings, were misbranded within the meaning of the sections of the Federal Food, Drug and Cosmetic Act involved herein; that the labeling on Marmola is false and misleading in its representations that it is a safe remedy for obesity, and in that it fails to reveal facts material with respect to consequences which may result from the use of Marmola under the conditions prescribed in the labeling.

The contention of the intervener that the sections of the act involved in these proceedings were not in force at the time of the seizure of the Marmola packages is disposed of by Section 902. It is clear from the reading of that statute that these sections were in force at the time of the commencement of these proceedings.

The libellant is entitled to a decree of condemnation as prayed for in the libel, with costs, and other proper expenses to be taxed against the intervener.