**DISTRICT OF COLUMBIA v. LITTLE.**

No. 10092.

United States Court of Appeals
District of Columbia Circuit.

Argued June 10, 1949.

Decided Aug. 1, 1949.

Writ of Certiorari Granted Nov. 7, 1949.
See 70 S.Ct. 141.

Judgment Affirmed Feb. 20, 1950.
See 70 S.Ct. 468.

Mr. Chester H. Gray, Principal Assistant Corporation Counsel, D. C., Washington, D. ·C., with whom Mr. Vernon E. West, Corporation Counsel, D. C., and Mr. Ed-ward A. Beard, Assistant Corporation Counsel, D. C., Washington, D. C., were on the brief, for appellant.

Mr. Jeff Busby, Washington, D. C., with whom Mr. Jeff Busby, Jr., Washington, D. C., was on the brief, for appellee.

Before PRETTYMAN and PROCTOR, Circuit Judges, and ALEXANDER HOLTZOFF, District Judge, sitting by designation.

PRETTYMAN, Circuit Judge.

Appellee Little was convicted in the Municipal Court for the District of Columbia upon an information which charged that on certain premises on a certain day she hindered, obstructed and interfered with an inspector of the Health Department in the performance of his duty. She appealed, and the Municipal Court of Appeals, in a unanimous opinion written by Associate Judge ·Clagett, reversed.[1] Because of the importance of the question to the enforcement of the health laws, we granted ·an appeal.

Appellee refused to unlock the front door of her home at the command of a Health Department inspector who was without a warrant. The question is whether she was within her constitutional rights in doing so, or whether she thereby illegally hindered him in the performance of his duty.

The inspector testified that he was ordered by the Health Officer to make an inspection of the premises after a complaint had been made "that there was an accumulation of loose and uncovered garbage and trash in the halls of said premises and that certain of the persons residing therein had failed to avail themselves of the toilet facilities".[2] It is not disputed that the premises is a private residence, the home of the appellee; that the inspector had no warrant either of arrest or search; that the appellee refused to unlock the front door, and that she was thereupon arrested.

The District of Columbia says that the Health Officer is fully empowered by valid statutes to enforce the public health laws;

---

1. Little v. District of Columbia, 1948, D. C.Mun.App., 62 A.2d 874.

2. The quoted description of the complaint is from the findings of the trial court.

that the Commissioners are likewise duly empowered to make all regulations necessary to protect the public health; that the regulations require owners and occupants of premises to maintain them in a clean and wholesome condition,[3] and that the same regulations authorize inspections and denominate as a misdemeanor interference with an inspection.

In respect of the Fourth Amendment, the District says that the attempted inspection was premised upon a complaint, which, if true, constituted probable cause to believe that a violation of law existed in the dwelling, and that the attempt was at a reasonable time of day by a uniformed officer who stated the purpose of his visit. It says that the view "expressed by the Municipal Court of Appeals is not consonant with the scope of the police power as indicated by the decisions of Courts controlling in this jurisdiction" and, further, that "it has been the view of the Congress, as shown by its statutory enactments limiting the right of inspection without warrant in certain specified activities under the police power, that it may unqualifiedly extend the right of inspection without warrant in such circumstances as it may deem necessary, so long as the police power is reasonably exercised." It also says that "Practical application of this holding [of the Municipal Court of Appeals] to the problems of enforcement of health laws in a large city would result in chaos. The whole purpose of the use of the police power by the health authorities is to prevent the creation of present and immediate dangers, to correct deficiencies before they become nuisances per se and before the public is endangered. While every authority recognizes the necessity for inspection, the effect of the Municipal Court of Appeals' opinion is to prevent it; for, if the danger is immediate and the nuisance apparent, the sovereign may protect the public by civil proceedings to abate it and by criminal prosecution of the guilty party—the necessity for inspection no longer exists."

The position of the District is summarized by it as follows: "In the view of appellant a more salutary rationale insuring effective protection of the health and safety of the public, and at the same time cognizant of the personal rights of the individual under the Fourth Amendment, would be a holding that an inspection of a private dwelling in aid of the police power as it relates to matters of health is valid even though without warrant, provided there is probable cause to believe that there exists within the dwelling a violation of law or regulation designed to protect the health, safety or welfare of the public and provided the inspection is attempted under circumstances and conditions of fact which are not unreasonable."

As a separate consideration, the District also presents an argument based upon some conflict in the testimony as to whether appellee was arrested for hindering the health officer by refusing to unlock the door on the premises or was arrested for interfering with a police officer in the arrest of another person at a police call box some distance down the street. That argument has no bearing upon the case, because the information upon which appellee was convicted charged her with interfering with the health inspector, not the policeman, upon

3. This regulation, in pertinent part, as found by the trial court, is:

"(2) It shall be the duty of every person occupying any premises, or any part of any premises in the District of Columbia, or, if such premises be not occupied, of the owner thereof, to keep such premises or part, * * *, clean and wholesome. If upon inspection by the Health Officer or an inspector of the Health Department, it be determined that any such part thereof, or any building, yard, * * * is not in such condition as herein required, the occupant or occupants of such premises or part, or the owner thereof, as hereinbefore specified, shall be notified and required to place same in a clean and wholesome condition; and in case any person shall fail or neglect to place said premises or part in such condition within the time allowed by said notice, he shall be liable to the penalties hereinafter provided.

* * * * *

"(10) That the Health Officer shall examine or cause to be examined any building supposed or reported to be in an unsanitary condition, and make a record of such examination; * * *."

the premises, not upon the public street, and with hindering the performance of duty by the health inspector, not with interfering with a police officer in the performance of an arrest.

We must delimit the question before us. Many of the problems discussed in the District's brief are not in the case. The simple question is: Can a health officer of the District of Columbia inspect a private home without a warrant if the owner or occupant objects?

The Fourth Amendment to the Constitution applies.[4] The Supreme Court has several times in recent cases exhaustively and emphatically discussed the invasion of private dwellings by government officers.[5] If there ever was any doubt upon the matter, it has surely now been laid to rest. The several opinions in those cases contain complete historical studies, relating to both federal and state governments, and many unequivocal declarations, quotable and unmistakable. We need not attempt to reproduce them here.

Democratic government has distinguishing features. One of them is freedom of speech for the individual; another is freedom of religion. Another is the right of privacy of a home from intrusion by government officials. These characteristics are not mere hallmarks. They are the beams and pillars about which the structure was built and upon which it depends. If private homes are opened to the intrusion of government enforcement officials, at the wish of those officials, without the intervening mind and hand of a magistrate, one prop of the structure of our system is gone and an outstanding characteristic of another form of government will have been substituted.

 When the Constitution prohibits unreasonable searches, it, of course, by implication, permits reasonable searches. But reasonableness without a warrant is adjudged solely by the extremity of the circumstances of the moment and not by any general characteristic of the officer or his mission. If an officer is pursuing a felon who runs into a house and hides, the officer may follow and arrest him. But this is because under the exigencies of circumstance the law of pursuit supersedes the rule as to search. There is no doctrine that search for garbage is reasonable while search for arms, stolen goods or gambling equipment is not. Moreover, except for the most urgent of necessities, the question of reasonableness is for a magistrate and not for the enforcement officer.[6]

 It is said to us that the regulations sought to be enforced by this search only incidentally involved criminal charges, that their purpose is to protect the public health. It is argued that the Fourth Amendment provision regarding searches is premised upon and limited by the Fifth Amendment provision regarding self-incrimination. It is said to us that therefore there is no prohibition against searches of private homes by government officers, unless they are searching for evidence of crime; that if they are searching for evidence of crime, they must get a search warrant, but that if they are searching for something else or are just searching, they need not get a search warrant; for searchers of the latter sort, we are told, home owners must open their front doors upon demand of an officer without a warrant. The argument is wholly without merit, preposterous in fact. The basic premise of the prohibition against searches was not protection against self-incrimination; it was the common-law right of a man to privacy

4. Neild v. District of Columbia, 1940, 71 App.D.C. 306, 110 F.2d 246; National Mutual Ins. Co. of D. C. v. Tidewater Transfer Co., Inc., 1949, 337 U.S. 582, 69 S.Ct. 1173.

5. Agnello v. United States, 1925, 269 U. S. 20, 46 S.Ct. 4, 70 L.Ed. 145; Harris v. United States, 1947, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399; Davis v. United States, 1946, 328 U.S. 582, 66 S.Ct. 1256, 90 L.Ed. 1453; Johnson v. United States, 1948, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436; McDonald v. United States, 1948, 335 U.S. 451, 69 S.Ct. 191, 93 L. Ed. ——; Wolf v. Colorado, 1949, 338 U.S. 25, 69 S.Ct. 1359.

6. Johnson v. United States, 1948, 333 U. S. 10, 13, 14, 68 S.Ct. 367, 92 L.Ed. 436.

in his home, a right which is one of the indispensable ultimate essentials of our concept of civilization. It was firmly established in the common law as one of the bright features of the Anglo-Saxon contributions to human progress. It was not related to crime or to suspicion of crime. It belonged to all men, not merely to criminals, real or suspected. So much is clear from any examination of history, whether slight or exhaustive. The argument made to us has not the slightest basis in history. It has no greater justification in reason. To say that a man suspected of crime has a right to protection against search of his home without a warrant, but that a man not suspected of crime has no such protection, is a fantastic absurdity.

■ The argument involves a basic error in reasoning in respect to the Constitution's Bill of Rights. The Fourth Amendment did not confer a right upon the people. It was a precautionary statement of a lack of federal governmental power, coupled with a rigidly restricted permission to invade the existing right. The right guaranteed was a right already belonging to the people. The reason for the search warrant clause was that public interest required that personal privacy be invadable for the detection of crime, and the Amendment provided the sole and only permissible process by which the right of privacy could be invaded. To view the Amendment as a limitation upon an otherwise unlimited right of search is to invert completely the true posture of rights and the limitations thereon.

Much of the argument of the District is devoted to establishing the public importance of the health laws. Assertions are also made of the beneficence and forbearance of health officers. We may assume both propositions. But the constitutional guarantee is not restricted to unimportant statutes and regulations or to malevolent and arrogant agents. Even for the most important laws and even for the

wisest and most benign officials, a search warrant must be had.

■ We emphasize that no matter who the officer is or what his mission, a government official cannot invade a private home, unless (1) a magistrate has authorized him to do so or (2) an immediate major crisis in the performance of duty affords neither time nor opportunity to apply to a magistrate. This right of privacy is not conditioned upon the objective, the prerogative or the stature of the intruding officer. His uniform, badge, rank, and the bureau from which he operates are immaterial. It is immaterial whether he is motivated by the highest public purpose or by the lowest personal spite.

■ To be certain that we have stated the rule no broader than existing law, one has only to read the cases cited supra in footnote 5; indeed, the opinions in McDonald v. United States alone are sufficient. Morton v. United States [7] and Section 3053 of Title 18 (new) of the United States Code Annotated are cited to support the proposition that an officer may enter any building if he has reasonable ground to believe that a person therein has committed a felony. Neither citation supports the proposition stated. The Morton case concerned the use of evidence seized in a search which was incidental to a lawful arrest for first degree murder. This court, in a careful opinion by Judge Justin Miller, recited the facts which demonstrated that the arrest was made and was lawful and that the officers were admitted without objection to the accused's quarters. Section 3053 of Title 18 of the United States Code makes neither mention of nor reference to searches. The historical fact is that the invasion of homes upon a suspicion on the part of a police officer alone, either that a felon was there or that a felony was being committed there, was one of the potent factors in the adoption of the prohibitory rule of the common law and in its recitation in the

7. 1945, 79 U.S.App.D.C. 329, 147 F.2d 28.

Fourth Amendment. That an officer merely suspects that a felon is in a house is a precise example of a situation in which a warrant is required, not of one in which a warrant need not be had.

■ The District lays great stress upon the fact that there was a complaint, succinct and definite. But, so far as we know, the existence of a complaint has never been held to be a basis for dispensing with a search warrant. Quite the contrary, the fact of a complaint shows (1) that there is an identifiable informant who could be taken before a magistrate; (2) that the enforcement officers have no direct or personal knowledge of the alleged offense; and (3) that in all reasonable probability a search warrant would be procurable. These are reasons for getting a warrant, not for failing to get one.

There is nothing about an accumulation of garbage or other matter deleterious to health which makes it difficult to obtain a warrant to search for it. It is as noticeable and as apt to complaint as are gaming equipment or stolen goods. Health officers may chafe at the inconvenience, but so do police officers.

■ Distinction between "inspection" and "search" of a home has no basis in semantics, in constitutional history, or in reason. "Inspect" means to look at, and "search" means to look for. To say that the people, in requiring adoption of the Fourth Amendment, meant to restrict invasion of their homes if government officials were looking for something, but not to restrict it if the officials were merely looking, is to ascribe to the electorate of that day and to the several legislatures and the Congress a degree of irrationality not otherwise observable in their dealings with potential tyranny.

We need not go beyond the record in this case for an example of the extremity to which the doctrine of the appellant District would take us. One of the two complaints made by the unidentified informant was that some of the occupants of the house "failed to avail themselves of the toilet facilities". Reducing appellant's doctrine to practicalities, the result would be that if the owner of a house be reliably charged with concealing a cache of arms and munitions for purposes of revolution, police officers could not search without either permission or warrant, but if the information be that an occupant fails to avail himself of the toilet facilities, government officials could enter and examine the house over protest and without a warrant. It may be that the boundary of the curtilage is no longer the outpost of man's domestic independence. It may be that a transom is debatable access. But even if the front door of the house is no longer protected by the Constitution, surely it had been thought until now that the bathroom door is.

The scope of appellant's doctrine is vivified by reference to the pertinent regulations. The occupant of any "part" of any "premises" is required to keep that part "clean and wholesome". To satisfy municipal officers that this mandate is met, the privacy of a home would be subjected to intrusion without restriction or limitation. Obviously, any such rule of law would wholly destroy that privacy. Under it, a home must be "clean and wholesome" in the judgment of municipal officials. By what standard and at what time of day is this perfection to be tested? And under what combination of domestic circumstances? Is the unassisted, overworked, overwrought mother of small uninhibited children to have less privacy to work out her family difficulties than the unencumbered bachelor in his serviced apartment? Is the evening radio hour to be at the whim of a zealous officer making bacteria counts on dinner dishes in the kitchen sink? Is the informality of a lone housewife doing the morning chores to be embarrassed by the unpreventable company of a benign, but nevertheless strange, searcher for the unclean and the unwholesome? These are extreme examples, perhaps, but they are no sillier than the precise words of the complaint in the present case, and we are dealing with doctrines and not with the presumable taste and sense of individual officials. Maybe none of these examples would ever occur. But the question before us is not whether they

would happen but whether they legally could.

In support of appellant's position, it is said that the purpose of the Fourth Amendment was to provide a remedy against general warrants, that general warrants had been sought only in criminal cases, and that the remedy should be construed as no broader than the evil. The reasoning gets a superficial plausibility from its curious substitution of incident for basic principle. It is true that the incident which gave rise to the furor in England and to the fears in this country was the invention of general warrants designed to accomplish an invasion of homes. And the adopters of the Amendment certainly intended to forestall any such in this country. But even if the second clause of the Amendment had been a specific prohibition against general warrants (which it is not), to say that the specific prohibition of one threatened violation of a basic right thereby validates every other violation of that right is both illogical and unrealistic. The present Chief Justice of the United States, writing for this court in Nueslein v. District of Columbia [8] when he was an Associate Justice here, disposed of the argument here made. No other discussion of that phase of the contention is necessary.

 We are told by the District that enactments by the Congress show an intention to permit invasion of homes without warrants. The Supreme Court said in Agnello v. United States,[9] "Congress has never passed an act purporting to authorize the search of a house without a warrant." And we find in Section 2236 of Title 18 of the United States Code, reenacted just a year ago, a crisp and emphatic indication of the attitude of the Congress upon the matter. That section provides: "Whoever, being an officer, agent, or employee of the United States or any department or agency thereof, engaged in the enforcement of any law of the United States, searches any private dwelling used and occupied as such dwelling without a warrant directing such search, or maliciously and without reasonable cause searches any other building or property without a search warrant, shall be fined for a first offense not more than $1,000; and, for a subsequent offense, shall be fined not more than $1,000 or imprisoned not more than one year, or both."

That statute does not apply to District of Columbia officials, but it clearly reflects the attitude of the Congress in respect to the matter. It seems unnecessary to add what is obvious to us, that any act of the Congress purporting to permit the invasion of homes by police officers without warrants, except under the established exception of unavoidable crisis, would not only be politically lethal to its proponents but would be wholly void.

It is said in support of appellant's position that Congress has never enacted a statute providing for search warrants except for the enforcement of criminal laws. It is argued from that premise that Congress views the whole Fourth Amendment as limited to criminal cases. Precisely the opposite conclusion is obvious to our minds. The absence of statutory provisions for search warrants except in criminal cases demonstrates conclusively that Congress means that the right of privacy shall not be invaded except in criminal cases. Search warrants are a means of invading a privacy which otherwise is not invadable at all.

Support for appellant's position is offered in sentences taken from opinions in cases which concerned both a Fifth Amendment question of self-incrimination and a Fourth Amendment question of search. Evidence taken in an allegedly illegal search was used against the owner or possessor in a criminal case. Obviously, in such cases observations upon the interrelationship of the two Amendments is natural and proper. But in none of them is there the slightest intimation that the right to privacy protected by the Fourth Amendment is limited to persons or things involved in suspected crime. It is unnecessary to describe each case mentioned in this connection. They simply do not support the proposition advanced to us.

8. 1940, 73 App.D.C. 85, 115 F.2d 690.

9. 1925, 269 U.S. 20, 32, 46 S.Ct. 4, 70 L. Ed. 145.

We have read all the other cases cited. None relates to the search of private dwellings. We need not discuss them at length. Some relate to seizures of goods in interstate commerce or pursuant to writs, some to production of goods or papers pursuant to governmental order, some to the validity of warrants or writs. Hubbell v. Higgins[10] dealt with the inspection of a hotel. It well illustrates the fallacy of the argument for which it is cited. Hotels are subject to government license, but no one has ever suggested that in this country a man could be required to have a license to have a home.

██ We hold that health officials without a warrant cannot invade a private home to inspect it to see that it is clean and wholesome, or to search for garbage upon a complaint that garbage is there, or to see whether the occupants have failed to avail themselves of the toilet facilities therein.

██ We do not reach the question whether a municipal regulation requiring private homes to be clean and wholesome, and denominating as a misdemeanor a violation of the regulation, is valid. Of course, regulations, like laws, which protect the public health, prevent nuisances and the like, applicable by terms and practice to conditions impinging upon the public interest, are valid and enforceable. And so, too, are emergency measures necessary in the case of persons with communicable diseases who are at large and refuse to co-operate with restrictive measures;[11] or in the case of other sudden emergencies involving the public. But when such regulations or laws purport to give officers authority to enter private homes, against the occupants' protests, and without a warrant, when no compelling emergency involving public health is involved, a serious question of constitutional validity is raised. Health

laws can be enforced in the same manner as are other laws. If an acute emergency occurs precluding reference to a court or magistrate, public officials must take such steps as are necessary to protect the public. But, absent such emergency, health laws are enforced by the police power and are subject to the same constitutional limitations as are other police powers. It is wholly fallacious to say that any particular police power is immune from constitutional restrictions.

██ We come now to a more difficult phase of the situation presented to us by the District government. It says that the statutes which prescribe the procedure for obtaining search warrants in the District of Columbia are so drawn that they are not available for the enforcement of health laws and regulations. Those statutes enumerate the articles or things for which search warrants may be issued and do not refer to articles or conditions offending the health laws.[12] This procedural omission requires action by the Congress, if the Congress deems it advisable that private dwellings be inspected in the course of enforcement of the health laws. The omission cannot be used as a premise for the conclusion that such inspections can be made without warrant or that Congress intended that they should be. It is untenable to argue that because Congress has failed to provide procedure for obtaining a search warrant, searches otherwise unconstitutional can therefore be made. The situation may well require immediate representations by the District authorities to the Congress for procedural implementation of important public health measures. That is a legislative problem. The function of the courts in situations such as this is to prevent violation by executive officials of constitutional guarantees.

---

10. 1919, 148 Iowa 36, 126 N.W. 914, Ann. Cas.1912B, 822.

11. Sec. 2, Act of Aug. 8, 1946, 60 Stat. 919, D.C.Code §§ 6—119a to 6—119k (1940) (Supp. VI).

12. 41 Stat. 726 (1920), as amended, 7 U. S.C.A. § 167, D.C.Code § 6—904 (1940)

(relating to plant diseases); D.C.Code § 22—805 (1940) (relating to cruelty to animals); 31 Stat. 1337 (1901), as amended, D.C.Code § 23—301 (1940) (relating to stolen goods, counterfeiting, gambling equipment, etc.); 52 Stat. 792 (1938), D.C.Code § 33—414 (1940) (relating to narcotics).

We concur in the opinion and judgment of the Municipal Court of Appeals, and its judgment is, therefore,

Affirmed.

HOLTZOFF, District Judge (dissenting).

With genuine respect for the views of my associates, I sincerely regret that I find myself unable to concur in their conclusion. With considerable hesitancy, I feel impelled to record my dissenting views because the case is one of novel impression involving an important principle of Constitutional law and the decision may have wide implications and far-reaching consequences.

The question presented for determination is whether an Act of Congress, or a municipal ordinance or regulation promulgated pursuant to an Act of Congress, that authorizes health officers in the District of Columbia to enter dwellings without a search warrant for the purpose of inspection, is violative of the provisions of the Fourth Amendment to the Constitution of the United States prohibiting unreasonable searches and seizures.[1] The same problem may arise in respect to building inspectors, plumbing inspectors, and similar officers.

The personal rights of the individual as safeguarded by the Constitution of the United States form one of the bulwarks of American political institutions. The Bill of Rights is a vital part of the foundation on which our Republic rests. It distinguishes us from countries where the rights of the individual citizen are not protected from encroachment by the Government. Ceaseless vigilance is indispensable in order to preserve and maintain these rights. There can be no difference of opinion as to these basic principles.

The problem presented in this case, however, is the definition and the delimitation of one of the fundamental rights guaranteed by the Constitution. The meaning of the terms found in the Bill of Rights cannot be ascertained by a mere recourse to the dictionary. The personal rights to which the Constitution relates are basic concepts. Their significance is to be found in the historical background in which they were nurtured and from which they are derived. Every provision of the Constitution of the United States is compact and succinct, and can be properly and correctly understood and construed only in the light of the annals of the past. The Founding Fathers were thoroughly versed in history and political science and used the terminology found in the fundamental document in its traditional and historical sense.

The Fourth Amendment does not ban all searches. It prohibits only those that are unreasonable. In determining what constitutes an "unreasonable search," we must delve into the antecedents of the Fourth Amendment and ascertain the meaning that was attached to that term by the framers of the Bill of Rights, among whom were some of the Founding Fathers.[2]

In Carroll v. United States, 267 U.S. 132, 149, 45 S.Ct. 280, 284, 69 L.Ed. 543, 39 A.L.R. 790, Chief Justice Taft stated: "The Fourth Amendment is to be construed in the light of what was deemed an unreasonable search and seizure when it was adopted, and in a manner which will conserve public interests as well as the interests and rights of individual citizens."[3]

1. Amendment IV. Searches and Seizures. "The right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

2. In Knowlton v. Moore, 178 U.S. 41, 95, 20 S.Ct. 747, 768, 44 L.Ed. 969, Mr. Justice White stated:

"The necessities which gave birth to the Constitution, the controversies which preceded its formation, and the conflicts of opinion which were settled by its adoption, may properly be taken into view for the purpose of tracing to its source any particular provision of the Constitution in order thereby to be enabled to correctly interpret its meaning."

3. In Harris v. United States, 10 Cir., 151 F.2d 837, 839, 169 A.L.R. 1413, affirmed 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399, Murrah, J., expressed the same thought as follows:

In Boyd v. United States, 116 U.S. 616, 624–625, 6 S.Ct. 524, 529, 29 L.Ed. 746, a case that constitutes a landmark in the law of searches and seizures, Mr. Justice Bradley stated: "In order to ascertain the nature of the proceedings intended by the fourth amendment to the constitution under the terms 'unreasonable searches and seizures,' it is only necessary to recall the contemporary or then recent history of the controversies on the subject, both in this country and in England."

The historical background of the Fourth Amendment is found in the struggle against the use of obnoxious general warrants and writs of assistance invoked by the English and Colonial governments for the purpose of making exploratory searches of homes with a view to discovery and seizure of incriminating books and papers, and contraband property. The celebrated opinion of Lord Camden, in 1765, in Entick v. Carrington, 19 Howell's State Trials 1029, emphatically condemned these arbitrary and oppressive measures. This decision is properly regarded as a notable milestone in the progress of human liberty. It must have been well known to the Founding Fathers, many of whom were profound scholars, and it is reasonable to assume that their thinking was influenced by that case.[4]

Referring to the Fourth Amendment, Story in his Commentaries on the Constitution of the United States, Sec. 1902, says: "its introduction into the amendments was doubtless occasioned by the strong sensibility excited, both in England and America, upon the subject of general warrants almost upon the eve of the American revolution."

The Fourth Amendment was intended and is to be construed to apply only to criminal prosecutions and proceedings of a quasi-criminal nature for the enforcement of penalties. Its purpose is to limit and regulate searches conducted with a view to discovering and seizing books, papers, and objects to be used as evidence in a criminal proceeding or in an action for the enforcement of a penalty; and to protect any person against the use of evidence in a criminal or penal proceeding, if it has been procured from him by an unreasonable search and seizure. It does not affect the administration of law if criminal prosecutions or suits for penalties are not involved. It does not apply to inspections, if no seizure is intended.

Thus, in Murray v. Hoboken Land and Improvement Co., 18 How. 272, 285, 15 L.Ed. 372, the Supreme Court held by a unanimous vote that the limitations of the Fourth Amendment did not apply to distress warrants for the collection of taxes. Mr. Justice Curtis made the following observation on this point: "But this article has no reference to civil proceedings for the recovery of debts, of which a search warrant is not made part."

Boyd v. United States, 116 U.S. 616, 634, 6 S.Ct. 524, 534, 29 L.Ed. 746, involved the application of the Fourth Amendment to

---

"The rights of one to be secure in his person, papers, and effects, against unreasonable search and seizure, and not to be compelled in a criminal case to be a witness against himself are fundamental rights under the 4th and 5th Amendments to the Constitution '[which] affect the very essence of constitutional liberty and security.' * * * The true meaning of these rights are to be derived from what was deemed an unreasonable search and seizure at the time of the adoption of the Amendments to the Constitution, and are to be construed in a manner which will serve the public interest on the one hand, while protecting and safeguarding the personal rights of individuals on the other."

4. That Lord Camden's strictures were directed against the use of general searches solely in connection with criminal prosecutions appears from the following statement in his opinion in Entick v. Carrington, 19 Howell's State Trials at 1073: "It is very certain, that the law obligeth no man to accuse himself; because the necessary means of compelling self-accusation, falling upon the innocent as well as the guilty, would be both cruel and unjust; and it should seem, that search for evidence is disallowed upon the same principle. There too the innocent would be confounded with the guilty."

Entick v. Carrington is recognized in Boyd v. United States, 116 U.S. 616, 626, 6 S.Ct. 524, 29 L.Ed. 746, as the precursor of the Fourth Amendment.

certain customs laws. In that case, the Court made the following observations: "As, therefore, suits for penalties and forfeitures, incurred by the commission of offenses against the law, are of this quasi criminal nature, we think that they are within the reason of criminal proceedings for all the purposes of the fourth amendment of the constitution, and of that portion of the fifth amendment which declares that no person shall be compelled in any criminal case to be a witness against himself; * * *."

The inference is clear that it was the view of the Supreme Court that the Fourth Amendment referred only to proceedings of a criminal or quasi-criminal nature.

There are a number of district court decisions to the same effect. Thus, in the case of In re Meador, 16 Fed.Cas. page 1293, No. 9,375, it was held that the limitations of the Fourth Amendment on the issuance of warrants do not apply in certain revenue cases. Similarly, in the case of In re Strouse, 23 Fed.Cas. p. 261, No. 13,548, it was stated, "The Fourth Amendment * * * is applicable to criminal cases only".

Coming to more recent decisions, in United States v. Eighteen Cases of Tuna Fish, 4 Cir., 5 F.2d 979, it was held that the Amendment does not apply to attachments under the Food and Drug Act, 21 U.S.C.A. § 1 et seq. In Camden County Beverage Co. v. Blair, 3 Cir., 46 F.2d 648, the authorities bearing on this point are exhaustively reviewed and the conclusion is reached that the Fourth Amendment does not apply to a proceeding to revoke a beverage permit, because it is civil in its nature and the Fourth Amendment is applicable only to proceedings of a criminal character.

In United States v. 62 Packages, Etc., D.C., 48 F.Supp. 878, 884, affirmed, 7 Cir., 142 F.2d 107, it was stated, that "the Fourth Amendment to the United States Constitution does not apply to a seizure process in civil actions." On the basis of this reasoning the conclusion was reached that pro-

ceedings under the Food, Drug and Cosmetic Act, 21 U.S.C.A. § 301 et seq., were not subject to the limitations of the Fourth Amendment.

No reported case has been found that extends the scope of the Fourth Amendment to fields other than criminal law or the enforcement of penalties. All the decisions cited in the opinion of the court in support of its conclusion involved criminal prosecutions.

The conclusion that the prohibitions of the Fourth Amendment are limited to proceedings of a criminal or penal nature, is supported by the fact that apparently the Congress has never enacted any statutes providing for the issuance of search warrants for any purpose other than the enforcement of the criminal law. The inference is clear that the legislative branch of the Government has continuously construed the Fourth Amendment in the manner here indicated. While this consideration is not conclusive, it is nevertheless entitled to great weight in interpreting the Constitution.[5] Specifically, there is no existing statute under which a health inspector, a plumbing inspector, or a building inspector may obtain a warrant authorizing him to enter a building for the purpose of a routine inspection. It has always been assumed that no search warrant is necessary. On the basis of the conclusion of the Court in this case, these officers may have to suspend their function of inspection until and unless the Congress passes an Act authorizing the issue of search warrants for this purpose. In the interim the District of Columbia may be confronted with a serious situation. Moreover, even if an Act providing for such search warrants should be placed upon the statute books, how can an inspector make a showing of probable cause as a basis for the issuance of a warrant for the purpose of an ordinary, routine examination? Regular periodic inspections are conducted for the purpose of making certain that laws relating to sanitation and safety are being observed. Such examina-

5. Prigg v. Pennsylvania, 16 Pets. 538, 621, 10 L.Ed. 1060; The Laura, 114 U.S. 411, 5 S.Ct. 881, 29 L.Ed. 147; Springer v. United States, 102 U.S. 586, 599, 26 L.Ed. 253; Field v. Clark, 143 U.S. 649, 691, 12 S.Ct. 495, 36 L.Ed. 294.

tions are not confined to situations in which there is a suspicion that the law is being violated. It is necessary that periodic inspections be regularly made for the purpose of securing observance of the laws and regulations relating to the safety and health of the community. If a search warrant were necessary for such recurring inspections, the requirement would amount to turning over the supervision of administration from the executive to the judicial branch of the Government, which, as the Supreme Court has observed in the past, would be a source of mischief and is contrary to the philosophy of our form of Government. The Constitution contemplates a tripartite division of Government into three coordinate branches. It was not intended that the judicial branch should have supervisory control over the executive.

Quarantine measures are enforced in large part by inspections. Their validity has been invariably accepted as inherent in the police power of the States and in the Federal power to regulate interstate commerce. For example, in recent years the Federal Government has had occasion to establish quarantines against certain insects. One of the means of enforcement has been to stop every vehicle crossing the quarantine line and examine its interior in order to ascertain whether it carried any plants that might in turn bear some of the insects. The inspection was purely exploratory and preventive, since it could not be said as to any particular vehicle there was reasonable cause to believe that it was transporting any plants. Nevertheless, although the right to search a vehicle arises only if there is reasonable ground to believe that it is carrying contraband,[6] such inspections have never been held repugnant to the Fourth Amendment. In fact, as a practical matter, regular and continuous inspections are indispensable in administering a quarantine.

Warrants issued by the courts are of two kinds: warrants of arrest and search warrants. The latter constitute authority to look for specified chattels and to seize them if found. There is no judicial document known to the law that would confer authority merely to inspect premises for the purpose of ascertaining whether certain laws, such as those relating to public health and public safety, are being observed. Such scrutiny has always been conducted by properly authorized officers without the requirement of judicial sanction. In effect, the opinion of the court proposes to create a new type of process, unknown to the common law or to any statute, and to confer power on the judiciary, that it has never possessed, to supervise the performance of routine administrative duties.

It is urged that inspections such as that in the instant case are an infringement of the sanctity of the home guaranteed by the Fourth Amendment. There is no doubt that the sanctity of the home is one of the fundamental private rights protected by the Constitution and must be safeguarded by the courts. The personal rights accorded to the individual by the first Ten Amendments are not, however, absolute or unqualified. For example, the right of freedom of speech is limited by the prohibition against publication of obscene material, against incitement to crime, and against the creation of public disorder. Mr. Justice Holmes, in his inimitable manner, observed that in the exercise of the right of freedom of speech, no one may rise in a crowded theater and yell "Fire!"[7] Similarly, the right of freedom of religion does not permit, in the name of worship, acts that are regarded as illegal, immoral, or offensive.[8] In the same way, the sanctity of the home is not absolute. For example, it is not disputed that representatives of the local government may enter a home if one of its inhabitants is afflicted with a

6. Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543, 39 A.L.R. 790.

7. Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470. See also Debs v. United States, 249 U.S. 211, 39 S.Ct. 252, 63 L.Ed. 566; Frohwerk v. United States, 249 U.S. 204, 39 S.Ct. 249, 63 L.Ed. 561; Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031.

8. Reynolds v. United States, 98 U.S. 145, 161 et seq., 25 L.Ed. 244.

serious contagious disease that constitutes a menace to the community. Representatives of the Fire Department require no search warrant to enter a house in order to extinguish a blaze, even if the owner objects to their presence. In many instances, it is proper for public authorities to enter a building to suppress a nuisance, such as a noisy gathering disturbing the peace of the neighborhood. A law enforcement officer may enter a house without a warrant in order to arrest a person who he has reasonable grounds to believe has committed a felony.[9] The law has always recognized that the sanctity of the home is not absolute, but is subject to certain limitations.

The right of inspection in the interest of public safety and public health is one of these qualifications. As was stated in Hubbell v. Higgins, 148 Iowa 36, 46, 126 N.W. 914, 918, Ann.Cas.1912B, 822:

"The power of the Legislature to provide for inspection of premises in the interest of public safety and the public health is so well established that we will not enter upon a discussion of it. The right of inspection is incidental to the police power, and counsel cite no case wherein it was ever held that the exercise of such power violates any constitutional right of the citizen."

In conclusion, I am of the opinion that the Fourth Amendment relates only to searches and seizures in connection with criminal prosecutions or enforcement of penalties, and does not affect inspections conducted in the course of the administration of statutes and regulations intended to promote public health or public safety. Consequently the statutes and regulations involved in this case are valid; the health inspectors of the District of Columbia had the right to enter respondent's home without a warrant for the purpose of inspection; and, accordingly, the judgment of the Municipal Court of Appeals should be reversed.

---

9. An obiter dictum contained in the opinion of the court, unwittingly perhaps, summarizes the power of the police to enter a building more narrowly than is justified by existing law. A law enforcement officer may enter a building and arrest without a warrant a person found therein, if the officer has reasonable ground to believe that this person has committed a felony. Morton v. United States, 79 U.S.App.D.C. 329, 147 F.2d 28; U.S.C.A. Title 18 (new) sec. 3053.