## THE STATE v. ED RAFTERY, Appellant.

**Division Two, June 28, 1913.**

1. **INSTRUCTIONS: Burglary and Larceny: Receiving Stolen Goods.** A defendant on trial for burglary and larceny is not entitled to an instruction "that the mere fact that he may have received a portion of the property alleged to have been stolen does not warrant the jury in finding him guilty."

2. **EVIDENCE: Admissions: Competency: Illegal Arrest.** Admissions made by 'a defendant while under arrest are not, if voluntary, rendered incompetent by a showing that the arrest was illegal.

3. **ARGUMENT OF COUNSEL: Objections and Exceptions: Appeal.** When a defendant objects to remarks of the State's counsel in his argument and the court after sustaining the objections asks the jury to disregard the statements, the defendant if not satisfied should ask such further action as he desires and should except to the action of the court in not more severely rebuking the State's counsel.

4. ————: **Failure of Defendant to Deny Incriminating Statements.** Counsel for the State has the right to comment on defendant's failure while on the stand to deny incriminating statements attributed to him by other witnesses.

Appeal from St. Louis City Circuit Court.—*Hon. Leo S. Rassieur,* Judge.

AFFIRMED.

*Charles P. Williams* for appellant.

(1) The court should have given the instruction asked for; or should at least have instructed that the mere receiving of stolen property was insufficient. R. S. 1909, sec. 5231; State v. Vinso, 171 Mo. 578; State v. Anslinger, 171 Mo. 600; State v. Fredericks, 136 Mo. 51. The necessity for such an instruction is plainly shown by the closing appeal of the assistant circuit attorney. (2) The comment of the assistant circuit attorney as to the failure of the co-defendant

to testify was most damaging; and when followed up at the very last, in the closing speech (always of great weight and influence in a criminal case) by the sinister suggestion as to the failure of the defendant to testify to certain things by way of explanation, prevented a fair trial. These remarks were mildly corrected by the trial court, but were never withdrawn by the circuit attorney. State v. Spivey, 191 Mo. 112; State v. Shouse, 188 Mo. 473; State v. Shipley, 174 Mo. 512; State v. Weaver, 165 Mo. 1; State v. Brownfield, 15 Mo. App. 593; State v. Fairland, 121 Mo. 137. (3) In spite of his just having given bond upon the charge against him, the defendant was seized by the police and carried for sweating before the chief of detectives, together with his brother. He was there subjected to the stories of his alleged confederates, and to a series of continued questionings himself. He was taken the next day under custody to the police station in North St. Louis, when he was again subjected to police interrogation. During all this time he was constructively out on bond under the guardianship of the court that had admitted him to bail, and the police officers were well aware of this fact. If a confession obtained under duress be inadmissible and ought to be disregarded, illegal imprisonment would seem to be one form of duress; and at the very least, the court should have fairly submitted the evidence upon this point to the jury, and accompanied it by an apt and appropriate instruction as to its voluntary or involuntary character, which the court failed to do. R. S. 1909, sec. 5231.

*John T. Barker,* Attorney-General, and *W. T. Rutherford,* Assistant Attorney-General, for the State.

(1) The defendant, by his counsel, asked the following instruction: "The court instructs the jury

that the mere fact that defendant may have received a portion of the property alleged to have been stolen does not warrant the jury in finding the defendant guilty." The court refused to give the instruction, and defendant, by his counsel, duly excepted. If it would be proper to give this instruction in any case of larceny, it was not error to refuse it in the case at bar, for the reason that there was no evidence authorizing it, or upon which it could be based. All of the testimony for the State showed the defendant a principal in the larceny, and all of the testimony for the defendant showed him to be innocent of the offense charged, or of receiving any part of the stolen money. A party engaged in the transaction is a principal thief, not a receiver. State v. Smith, 37 Mo. 67; State v. Horrig, 78 Mo. 252; 25 Cyc. 59, par. D. By all the evidence in the case the defendant was either guilty as a principal in the larceny charged, or he was innocent. There was not a scintilla of evidence that he was guilty of receiving stolen property. When there is no evidence upon which to predicate an instruction, it is proper for the court to refuse the instruction requested. State v. Coffee, 158 Mo. 572. The defense was an alibi, and there was evidence tending to sustain that defense, and the defendant was guilty of the larceny charged or guilty of no offense at all, and the instruction was properly refused. State v. Whalen, 148 Mo. 290; State v. Anslinger, 171 Mo. 609. The most that can be said for the defendant, that when he was confronted by the gypsy boy, Burns, and Kennedy in the police station and heard them detail the manner of the larceny and implicate him as an active participant in the commission of the offense, he neither admitted nor denied their accusation, but cursed them. His silence was a confession. Underhill on Crim. Ev., p. 153, par. 122; State v. Good, 132 Mo. 114; State v. Mullins, 101 Mo. 514; State v. Taylor, 134 Mo. 133. (2) The mere fact that defendant ,

was held without process or otherwise in illegal custody cannot exclude his statements or confessions. Underhill on Crim. Ev., p. 163, par. 129; State v. Simon, 50 Mo. 370; State v. Carlyle, 57 Mo. 102; State v. Shackelford, 148 Mo. 393; State v. Vaughan, 152 Mo. 73; State v. Church, 199 Mo. 605; State v. Spaugh, 200 Mo. 571; State v. Armstrong, 203 Mo. 571; Balbo v. People, 80 N. Y. 484. (3) For a discussion regarding comment by the State's counsel on the failure of the defendant to deny incriminating statements, see State v. Larkin, 250 Mo. 218, and the State's brief therein.

ROY, C.—Defendant was charged jointly with John Burns, alias Podgy Burns, and James Kennedy with burglary and larceny. There was a severance, and the defendant, on a separate trial, was convicted of grand larceny, and sentenced to the penitentiary for two years.

**Burglary and Larceny.**

Milasch Vlado and Nicholas Vlado, father and son, gypsies, lived on O'Fallon street in St. Louis, the former at No. 1525 and the latter at No. 1523. They were both married and there was another married son of the father who lived with him. Milasch and his son Nicholas each had about $4000. About six thousand dollars of it was in American gold coin, and the remainder was in foreign coin of various countries. It was kept partly in an old piece of hose over three feet long, and partly in some bags, all wrapped in canvas and kept on the bed in the house of the elder Vlado. The wife of Nicholas Vlado had a nephew, George Nicholas, about seventeen years of age, who came from Chicago to St. Louis in March, 1912. When George Nicholas arrived in St. Louis, his uncle Nicholas Vlado was on a trip to Chicago. While in Chicago Nicholas Vlado learned that George Nicholas had stolen some money from a gypsy in Chicago and had gone to St. Louis. On arriving home

about March 17, he found George at his (Nicholas Vlado's) home, and drove him away because of the theft.

Will Powers kept a saloon at Fifteenth and Biddle, close to the home of the Vlados.

On the night of March 19, Milasch Vlado and his son Nicholas were intiated into the lodge of the Knights of Pythias and did not return until some time after midnight. The wife of Milasch Vlado and her little granddaughter slept that night in the bed with their heads on the canvas in which the money was kept. About half past eleven o'clock that night George Nicholas, James Kennedy, Podgy Burns, Ben Shaw and Will Powers were all at the saloon of Powers. The question in issue in the trial was whether the defendant was in company of those who went to Vlado's house and got the money. George Nicholas testified that he informed Raftery, Shaw, Burns and Kennedy that the Vlados had money and that they all went to Vlado's house, found the doors open, went in, and went to the bed where Vlado's wife was sleeping and got the money. They carried it to Powers' saloon and scattered it on the floor, Powers being present; and that they all "grabbed" for the money, and thus the division of the booty was made. George Nicholas and the defendant went into hiding. George Nicholas was brought back from Cincinnati by the officers of the law. The defendant, knowing that the police were after him, surrendered to the sheriff and gave bond for his appearance and was released. The police promptly rearrested him.

The gypsy boy, Burns, Kennedy and the defendant were all brought together by the police who were in charge of them, and Sergeant Campbell testified as follows as to what then occurred:

"Mr. Shaner: I will ask you what you asked Kennedy in reference to this stealing, and what Ken-

nedy said?   A.   Kennedy said that they had went to this place——

"Q.   That who went?   A.   That he, Burns, Raftery and the gypsy boy, and that Raftery, and I disremember who else, went up in the house—Burns, I think it was—and this fellow had a knife, Raftery, and then, they returned and had the gypsy boy, cursing him, says, 'God damn you, that money isn't there.' They took the gypsy boy up then and he located the money for them.   Kennedy said they brought the money from there over to the saloon, Raftery helping carry the money, helped to carry it down the steps, and that Raftery and Burns took the hose and dumped it out on the floor and the proceeds was divided there, and that Raftery had taken one of the sacks and went out of the side door of the saloon; then they had left. And Burns quoted it pretty near word for word the same way.

"Mr. Shaner:   What did Raftery say in answer to that, or what did you ask him?   A.   I asked Raftery if that was true, what Kennedy and Burns had just told, and he said they were 'God damn rabbiting sons of bitches' and that there was no 'rabbit' in him. He says, 'Go on with their rabbiting; let them rabbit.' I asked him what he meant by 'rabbiting;' he said he was doing no snitching.

"Q.   What did he say further in reference to what he got, if anything?

"Mr. Gernez:   I object to that as leading.

"The Court:   What, if anything, did he say about this money?   A.   I asked him how much of the proceeds he got; he said he got $150 for his share and he knew where the rest of the money was.   I think, as near as I can remember, that is the words he used; and there was no rabbit in him, go on and give him the third degree.   He turned his head to one side and says, 'Give me the third degree, you sons of bitches. I know where it is at, and I'll tell you nothing.'   I then

touched him on the shoulder and told him to set up
straight, that nobody was going to abuse him, or give
him the third degree, to set up straight in the chair
and answer what questions were asked him.

"Mr. Shaner: Is that all that took place, or do
you remember anything else? A. That is about as
much as I remember."

The foregoing testimony as to admissions made
by defendant was objected to on the ground that
the defendant was under illegal arrest when the state-
ments were made and that such statements were made
under duress. The objection was overruled.

On the trial the defendant testified that he took
no part in the robbery, and that he did not get any
of the money. He admitted in his testimony that he
was present when the money was scattered on the
floor of the saloon. With reference to what occurred
in the division of the money, he testified as follows:

"Q. When they came in what did they do? A.
They first set the money down on the table and that
woke me up; I was in a half doze, my head down on
the table, and Shaw says this is too bright a place
for to split this money up here; so he walked behind
the counter and the rest of them followed him.

"Q. What happened then? A. And I walked
over myself. I walked over to him and Shaw says,
'Why, you're not in on this, Raf. You are not in on
this money at all.'

"Q. What did he do when he said that? A. He
jumped right back and pulled out a nickel plated forty-
four Colt's and stuck it to my stomach and says, 'You
back out of here.'

"Q. What did you do? A. I hesitated a min-
ute, and he says, 'If you don't go I'll make it good.'
That is the words he said.

"Q. Had you been with those people or any of
them up to this gypsy house? A. No, sir, I had not.

"Q. Or taken any part in taking that money? A. No. sir."

There was evidence on the part of defendant tending to prove that he did not go with the others to the house of Vlado.

The instruction given fully covered the law in the case, and no criticism is made of them. The defendant requested the court to give the following instruction which was refused:

"The court instructs the jury that the mere fact that defendant may have received a portion of the property alleged to have been stolen does not warrant the jury in finding the defendant guilty."

In the course of his argument to the jury counsel for the State called attention to the fact that the persons indicted with defendant did not testify for him, when the following occurred:

"Mr. Gernez: I except to the remarks of the circuit attorney, and now ask that the court declare a mistrial.

"The Court: The court will not declare a mistrial, but the court will instruct the jury to disregard the reference of the circuit attorney to the other witnesses who are jointly charged with the defendant." Counsel for the State then proceeded with his argument as follows:

"What is there to base a reasonable doubt on? It is true the defendant denies that he went over there and took part in this larceny, but he does not deny the proposition that he did get $150, and that he had some more of it hid out.

"Mr. Gernez: I object to those remarks of the circuit attorney.

"The Court: Mr. Shaner, the defendant was not required to testify with reference to any portion of this case and you will not comment on any portion of the case that he did not testify about. I will ask the jury to disregard that statement.

"Mr. Shaner: Gentlemen, I do not desire to comment on the case further. I will leave the case with you."

I. The court did not err in refusing defendant's requested instruction on the subject of receiving stolen goods. That was not an offense involved in the case, and the defendant could not have been convicted of such offense under the information in this case. The rule in regard to instructing on a lower degree of the crime charged does not apply here. The situation here is the same as if the defendant had selected any other fact in the case and had told the jury that such fact, of itself, would not justify a conviction. Such procedure is condemned by this court in State v. Williams, 136 Mo. 293; State v. Cantlin, 118 Mo. l. c. 111, and State v. Mitchell, 229 Mo. l. c. 697.

*Instructions: Receiving Stolen Goods.*

II. There was no fact tending to show that the admissions made by defendant were not made voluntarily. The fact that he was under an illegal arrest does not render such admissions incompetent in the absence of a showing that they were not voluntary. It was held in State v. Armstrong, 203 Mo. l. c. 559, that the fact that the confession was made to an officer having defendant under arrest did not render the confession incompetent. There are many other cases in this State to the same effect:

*Evidence: Admissions; Illegal Arrest.*

"And according to the weight of authority, a confession, if otherwise admissible, cannot be rejected for the reason that the officer to whom it was made held the prisoner in custody upon an invalid process, or without any process or legal right." [6 Am. & Eng. Ency. Law (2 Ed.), 539.]

State v. Raftery.

In Thornton's case, 1 Lewin's Crown cases, 49, the prisoner, a boy fourteen years of age, confessed under the following circumstances. He was arrested without warrant between twelve and one o'clock in the day, and carried to the police office. He was not taken before the magistrate because that officer was otherwise engaged. Between four and five o'clock the officer of his own authority ordered the prisoner to prison. The officer told the prisoner that on account of the falsehoods the prisoner had told there was no doubt he had set the building on fire. The prisoner denied it. The officer replied that he could not have told so many falsehoods if he had not been concerned in it. The prisoner had no food until after his confession. It was held by seven judges against three that the confession was competent. Confessions or inculpatory statements are not inadmissible in evidence if voluntarily made, although the defendant be under arrest at the time; and this is true whether the arrest be legal or illegal. [Scott v. State, 3 Ga. App. 479; Ivey v. State, 4 Ga. App. 828.] In Hoober v. State, 81 Ala. 51, a negro girl about seventeen years old was in the service of the prosecutrix, and on the morning of the burning of the house, her mistress locked her up in an outhouse, and said to her, "Now, I reckon you will tell me something about burning the house, I believe you know all about it," in reply to which she made a confession. It was held that the confession ought not to have been admitted, the court saying, "it is not entirely settled that confessions made by one in a state of illegal imprisonment without more are to be deemed involuntary upon the ground that the necessary inference is that they were produced by the duress of such imprisonment."

The mere fact that two officers who had arrested a boy thirteen or fourteen years old, without a warrant, upon suspicion of having committed a crime, af-

ter searching him, stripped him of his clothing, and putting him into a cell at the police station, took him from the cell late at night and questioned him for two hours, without warning him of his right not to answer, or offering him opportunity to consult friends or counsel, does not render his confession in the conversation inadmissible on his trial for the crime. [Commonwealth v. Cuffee, 108 Mass. 285.]

"It appeared that in point of fact no inducements were held out by the officer, nor threats made to the prisoner; but the conversation was free and voluntary upon the part of the prisoner. Indeed, the contrary is not pretended in argument; but it is claimed that, as the prisoner was not taken before a magistrate within twenty-four hours after his arrest by the officer, the custody in which he was at the time of the conversation referred to was an *illegal custody,* and that what was said, while in such custody is *for that reason only* inadmissible as evidence against him. We think, however, that this position finds no countenance either in principle or authority." [People v. Devine, 46 Cal. 46.] In Balbo v. People, 80 N. Y. 484, the court said: "The fact that the arrest was illegal had no relevancy, if the confession was voluntary. The people are not precluded from availing themselves of the voluntary confession because the officer or person to whom it was made was exercising an illegal restraint over the prisoner at the time."

We have not been able to find a single case in which it has been held that the mere fact that the prisoner was held in illegal custody would invalidate an admission or confession made while in such custody, in the absence of other showing that the statement was involuntary. The statement of the police officer clearly shows that the defendant made the statements attributed to him without any fear of the police, and without any promise from them.

III. Complaint is made of the conduct of the counsel for the State in his argument to the jury. The defendant objected to certain remarks

**Argument of Counsel.**

shown in the statement. The court in effect sustained defendants objection and asked the jury to disregard the statement. No further action was taken by defendant. Under the ruling in State v. Wana, 245 Mo. 1. c. 563, if defendant was not satisfied with the action of the court in the matter he should have asked such further action, as he desired, and should have excepted to the action of the court in not more severely rebuking the State's counsel.

Moreover, this court has recently held in State v. Larkin, 250 Mo. 218, that counsel for the State has the right to comment on the failure of the defendant while on the stand to deny

**Failure to Deny Incriminating Statements.**

incriminating statements attributed to him by other witnesses. It is a wholesome rule, and we abide by it. The judgment is affirmed. *Williams, C.,* concurs.

PER CURIAM.—The foregoing opinion of Roy, C., is adopted as the opinion of the court. All of the judges concur.