**Eugene SMITH, Appellant,**

v.

**UNITED STATES of America,**
Appellee.

No. 14126.

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 8, 1958.

Decided March 27, 1958.

Mr. John D. Fauntleroy, Washington, D. C. (appointed by the District Court) for appellant.

Mr. Nathan J. Paulson, Asst. U. S. Atty., with whom Messrs. Oliver Gasch, U. S. Atty., Lewis Carroll and Alfred Hantman, Asst. U. S. Attys., were on the brief, for appellee.

Before PRETTYMAN, BAZELON and BASTIAN, Circuit Judges.

BASTIAN, Circuit Judge.

This appeal is from a conviction under the narcotics laws.

The record discloses that on March 26, 1957, Lawrence O. Hayden, a special employee of the Metropolitan Police Department, went to the premises 2105 Fifth Street, N. W., Washington, D. C., accompanied by members of the Narcotics Squad, to purchase narcotics. Under the observation of the police, and after he had been searched for money and narcotics,[1] the special employee went into the house, entering the rear door, saw appellant, and asked the latter to sell him drugs. After discussion as to quantity, appellant agreed to and did sell to the special employee three capsules of heroin, which appellant took out of a small "Bufferin" bottle. Hayden then left the house. He gave the narcotics to the officers and informed them of what had transpired, describing appellant to them. No one had either entered or left the house while Hayden was in the premises.

Hayden was again searched and it was found that the marked five dollar bill which he had in his possession when he entered the house was no longer in his possession. A preliminary field test made by the officers of the three capsules purchased by the special employee showed the presence of narcotics.

The officers went to the rear door of the house, knocked on the door, and announced that they were police officers. When no one opened the door, they turned the knob and entered; they did not force their way in through the back door. The officers had no arrest or search warrant. No one had entered or left the premises between the time Hayden left the house and the time the officers entered. They immediately placed appellant and certain other occupants of the house under arrest. Appellant, at the time of the arrest, admitted to them the sale of the narcotics. Search of appellant and of the premises was then conducted. The search of appellant revealed the marked money and an empty "Bufferin"

bottle; and, from an upstairs room, narcotics paraphernalia[2] was seized.

Before trial appellant made a motion to suppress certain evidence allegedly illegally seized. The court granted the motion to suppress the marked five dollar bill found on appellant's person, which was all that appellant had asked. Appellant denied ownership of the other items seized.

On the date set for trial and just before the jury was sworn, appellant orally moved, before the same judge who had disposed of the motion as to the five dollar bill, to suppress all statements and all evidence taken after the arrest and search. The trial court did not dispose of the motion at the time it was made but told counsel for appellant that he would "take care of that as we reach it." The case proceeded to trial.

The attorney for the Government had the narcotics paraphernalia and the "Bufferin" bottle marked for identification only but, when they were offered in evidence, the court ordered them excluded and instructed the jury to disregard those items. Appellant claims as error the action of the trial court in allowing the Government to present such evidence even for identification purposes.

Appellant complains that the oral confession made by him after his arrest was inadmissible as having been made in the course of an illegal arrest and in the course of an allegedly unreasonable search and seizure.

■■ As to the legality of the arrest, the rule is settled in this jurisdiction, as it is in many others, that a law officer may arrest without a warrant where a felony has been committed and there is probable cause to believe the arrested person committed it. See, e. g., Shettel v. United States, 1940, 72 App. D.C. 250, 113 F.2d 34. We realize, of course, that the fact that the premises are a residence requires stricter require-

---

1. No narcotics were in Hayden's possession. He had, among other money, a marked five dollar bill given him by the officers.

2. A hypodermic needle, syringe and a stocking tourniquet.

ments of reasonableness.[3] Davis v. United States, 328 U.S. 582, 66 S.Ct. 1256, 90 L.Ed. 1453. But a search incident to an arrest which is otherwise reasonable is not automatically rendered invalid by the fact that a dwelling place, as contrasted to business premises, is subjected to search. See Harris v. United States, 331 U.S. 145, 151, 67 S.Ct. 1098, 91 L.Ed. 1399.

■■■ Here the law officers had searched the special employee and found no narcotics before he went into the premises. They had given him marked money and, while under their observation, he went into and returned from the premises. Upon his return, the officers again searched the special employee and discovered the capsules and the absence of the marked money. A preliminary field test performed at that time on the capsules showed the presence of a narcotic drug. The special employee had informed the officers of the purchase of the capsules from appellant. The officers clearly had probable cause to arrest appellant.

The problem then is whether the officers had authority to proceed to the house and make the forthwith arrest; whether under the circumstances they were required to get a warrant; whether the search incident to the arrest was proper; and whether the statement of appellant made contemporaneously with the arrest was properly received in evidence.

The rule is well settled that an officer who arrests a person for a felony committed in his presence may search not only the person but also the place where he is discovered, and other places in the immediate vicinity which formed part of the scene of the crime. Here the seizure was practically contemporaneous with

the arrest, the felony having been committed in the presence of the officers. The arrest was lawful, and immediately thereafter a search of the appellant was made and of the place where the sale took place. In our opinion both the arrest and the search were proper.

The case of Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145, is closely akin to the present one. There Agnello, one Alba, and several others were indicted for conspiracy to violate the Harrison Act, 26 U.S.C.A. (I.R.C. 1954) § 4701 et seq., they being charged with conspiracy to sell cocaine without having registered with the Collector of Internal Revenue and without having paid the prescribed tax. The evidence introduced by the Government indicated that two persons employed by Government revenue agents for that purpose [as was Hayden here] went to the home of Alba and offered to buy narcotics from him and one Centorino. Alba gave them some samples; and it was arranged that the employees would come again on the Monday following, at which time they returned. Revenue officers and a city policeman followed them and remained on watch outside. Alba left the house and returned with Centorino. Centorino, followed by certain of the officers, went to his own house and thence to a grocery store belonging in part to Agnello, another part of which was Agnello's home. In a short time Centorino and Agnello came out of the last mentioned place and went to Alba's house. Looking through the windows, the officers saw Agnello produce a number of small packages for delivery to the employee of the revenue agents and saw the employee hand over money to Alba. Upon the apparent consummation of the sale, the officers rushed in and arrested all the defendants. Some of the packages were found on the table where

3. It is to be noted that there was no evidence at the trial that the premises entered were those of appellant. The premises entered were 2105 Fifth Street, N. W., Washington, D. C. At the hearing of the motion to suppress (appellant did not take the stand at the trial) appellant testified that he lived at 1332 Vermont Avenue, N. W., Washington, D. C.; that a friend, who owned the premises 2105 Fifth Street, N. W., had instructed him to take care of that house and the furniture while he was in Philadelphia; and that appellant occupied a bedroom in 2105 during the time the owner was away.

the transaction had taken place and others were found in Agnello's pockets, all containing cocaine. On searching Alba the officers found the money given to him by the agent. While certain of the revenue officers were taking the defendants to the police station, the others went to Agnello's home and, in his bedroom, found a can of cocaine, which was offered in evidence. Admission was denied. However, when Agnello, on the witness stand, denied that he had ever seen the narcotics, the Government was permitted to put in evidence the can of cocaine seized in his home. The court also permitted to be received in evidence the articles obtained in Alba's home as incident to the arrest. The Supreme Court reversed the case as to Agnello because the search of Agnello's premises was not incident to the arrest, but affirmed as to Alba and others. In its opinion the Supreme Court said:

"The right without a search warrant contemporaneously to search persons lawfully arrested while committing crime and to search the place where the arrest is made in order to find and seize things connected with the crime as its fruits or as the means by which it was committed, as well as weapons and other things to effect an escape from custody is not to be doubted. * * * The legality of the arrests or of the searches and seizures made at the home of Alba is not questioned. Such searches and seizures naturally and usually appertain to and attend such arrests. But the right does not extend to other places. Frank Agnello's house was several blocks distant from Alba's house, where the arrest was made. When it was entered and searched, the conspiracy was ended and the defendants were under arrest and in custody elsewhere. That search cannot be sustained as an incident of the arrests." Id. 269 U.S. at pages 30–31, 46 S.Ct. at page 5.

The Court pointed out further: "While the question has never been directly decided by this court, it has always been assumed that one's house cannot lawfully be searched without a search warrant, *except as an incident to a lawful arrest therein.*" (Emphasis supplied.)

It seems to us that the Agnello case fits the instant case perfectly. Here the arrest was legal and the search was an incident to the lawful arrest.

See also Nueslein, infra, where this court said [73 App.D.C. 85, 115 F.2d 696]: "That is why the rule has grown up that in felony cases officers may enter a suspect's home upon probable cause to arrest him, and then conduct a search incidental to the arrest."

The authoritative answer is also found in United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653. We should note that in the instant case the officers believed that by the time they could get a search warrant there would be no narcotics in the premises. But, assuming that the officers had time to procure an arrest or a search warrant, were they bound to do so in this particular case? We think not. We are bound by this language in Rabinowitz:

"A rule of thumb requiring that a search warrant always be procured whenever practicable may be appealing from the vantage point of easy administration. But we cannot agree that this requirement should be crystallized into a *sine qua non* to the reasonableness of a search. It is fallacious to judge events retrospectively and thus to determine, considering the time element alone, that there was time to procure a search warrant. Whether there was time may well be dependent upon considerations other than the ticking off of minutes or hours. The judgment of the officers as to when to close the trap on a criminal committing a crime in their presence or who they have reasonable cause to believe is committing a felony is not determined solely upon whether there was time to procure a search warrant. Some flexibility will be accorded law officers engaged in

daily battle with criminals for whose restraint criminal laws are essential.

"It is appropriate to note that the Constitution does not say that the right of the people to be secure in their persons should not be violated without a search warrant if it is practicable for the officers to procure one. The mandate of the Fourth Amendment is that the people shall be secure against *unreasonable* searches. It is not disputed that there may be reasonable searches, incident to an arrest, without a search warrant. Upon acceptance of this established rule that some authority to search follows from lawfully taking the person into custody, it becomes apparent that such searches turn upon the reasonableness under all the circumstances and not upon the practicability of procuring a search warrant, for the warrant is not required. To the extent that Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663, requires a search warrant solely upon the basis of the practicability of procuring it rather than upon the reasonableness of the search after a lawful arrest, that case is overruled. The relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable. That criterion in turn depends upon the facts and circumstances—the total atmosphere of the case. It is a sufficient precaution that law officers must justify their conduct before courts which have always been, and must be, jealous of the individual's right of privacy within the broad sweep of the Fourth Amendment." Id., 339 U.S. at pages 65–66, 70 S.Ct. at page 435.

 Only unreasonable search and seizure is proscribed by the Fourth Amendment and there is no exact formula for determining reasonableness; each case depends on its own facts and circumstances. In the absence of a warrant an officer must show probable cause. Was there here reasonable ground of suspicion supported by sufficiently strong circumstances to warrant a cautious man's belief that appellant was guilty of a violation of the narcotics laws? We think no reasonable man can doubt that probable cause did exist.

Appellant relies on Nueslein v. District of Columbia, 1940, 73 App.D.C. 85, 115 F.2d 690, but that case is of no help to appellant. In Nueslein, the law officers, in pursuance of a general investigation of an automobile accident, entered the home of the defendant without "color of right," as the court expressed it. A taxicab had struck a parked car; and, in an unoccupied cab, parked some distance from the scene of the accident, the police saw the registration card and character license of the cab owner. They went to the owner's house, knocked on the door, and received no reply. Then, without a search or arrest warrant, they either opened the door or passed through the door already open and entered the house. After some time, the owner of the taxicab came downstairs and stated that he was driving the cab at the time of the accident. He appeared to be under the influence of liquor. Thereupon, he was placed under arrest and later convicted of driving an automobile while under the influence of liquor. The court said:

"The officers, in the pursuance of a general investigation, entered the home under no color of right. They did not know that the defendant was driving the car; they did not know that any offense had been committed. If they had gone after a search warrant what would have been the crime charged, what evidence would have been detailed as pertinent? The absence of a search warrant could scarcely make good an entry for which no warrant could have been obtained. Even if a warrant could have been made out, it is still unreasonable to enter a home without one where only a misdemeanor not committed in the presence of

officers could have been charged. When the officers entered they were just investigating. They were still illegally investigating when the defendant told them that he was driving the cab at the time of the accident. The officers looking him over adjudged him to be drunk, and then, and not until then, two and two equaled a drunken driving charge— a charge which can be made without an accident, the only starting point for this investigation. Then the officers took the defendant into custody, again violating his security." 73 App.D.C. at pages 88–89, 115 F.2d at pages 693–694.

The court stated further:

"While the IVth Amendment applies to the innocent, the misdemeanants, and the felons, what is an unreasonable search depends upon the nature and importance of the crime suspected, if any. That is why the rule has grown up that in felony cases officers may enter a suspect's home upon probable cause to arrest him, and then conduct a search incident to the arrest. This defendant may have driven a taxi while under the influence of an alcoholic beverage; at least for some reason he wrinkled the fender of an unoccupied parked car, but the public interest in this case does not call for the rough and speedy conduct of officers tracking down a felon. At most, the officers could have guessed that the defendant committed some misdemeanor." 73 App.D.C. at page 91, 115 F.2d at page 696.

The differences between the facts in Nueslein and the instant case are apparent. In Nueslein there was no probable cause for an arrest of Nueslein up to the time the search was made. Moreover, only a misdemeanor was involved. Here a felony was involved, and probable cause existed to believe that the felony had been committed and that Smith had committed it. The present case is not one where a search is attempted to be made legal by what it turns up. See United States v. Di Re, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210.

Appellant also relies on McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819. That case obviously has no relation to the case here. There the question involved was illegal detention, flagrant disregard of Acts of Congress requiring that accused persons arrested by federal officers be taken forthwith before a proper judicial officer for hearing, commitment or taking bail for trial. No such claim may be made here. The inculpatory statement was made immediately on the arrest and there was no illegal detention, such as was present in McNabb.

It is significant that § 2236 of Title 18, U.S.C. (1952), provides as follows:

"*Searches without warrant.* Whoever, being an officer, agent, or employee of the United States or any department or agency thereof, engaged in the enforcement of any law of the United States, searches any private dwelling used and occupied as such dwelling without a warrant directing such search, or maliciously and without reasonable cause searches any other building or property without a search warrant, shall be fined for a first offense not more than $1,000; and, for a subsequent offense, shall be fined not more than $1,000 or imprisoned not more than one year, or both.

"This section shall not apply to any person—

\* \* \* \* \* \*

"(b) arresting or attempting to arrest a person committing or attempting to commit an offense in his presence, or who has committed or is suspected on reasonable grounds of having committed a felony; \* \* ".

Also, § 4–140, D.C.Code 1951, provides:

"*Arrests without warrant.* The several members of the police force shall have power and authority to immediately arrest, without warrant, and to take into custody any

person who shall commit, or threaten or attempt to commit, in the presence of such member, or within his view, any breach of the peace or offense directly prohibited by Act of Congress, or by any law or ordinance in force in the District, but such member of the police force shall immediately, and without delay, upon such arrest, convey in person such offender before the proper court, that he may be dealt with according to law."

It would be a travesty if, a felony having been committed under the very eyes of an officer of the law, the officer had to wait until an arrest warrant could be obtained and thus, perhaps, allow the felon to get away. Must a law officer stand helplessly by while the person who has committed a felony in the officer's very presence walks away in comparative safety, thereby perhaps escaping the just punishment for his crime? And, if such a person is arrested, is a contemporaneous inculpatory statement to be excluded? Certainly, unless the enforcement of the criminal law is to be hamstrung, such an arrest is proper and a contemporaneous inculpatory statement, freely and voluntarily given, should be received in evidence.

We believe the rule to be that confessions made while a defendant is under arrest are admissible in evidence if voluntarily made and if Rule 5, Federal Rules of Criminal Procedure, 18 U.S. C.A., is not violated, whether the arrest was legal or illegal. See Gibson v. United States, 1945, 80 U.S.App.D.C. 81, 84, 149 F.2d 381, 384, where we said:

"The marihuana obtained by the officers from the Providence Street house was the basis of the second count of the indictment against O'Kelley, and his statements to the officers following his arrest and his other statement the next day were,

as he admitted, entirely voluntary, and though when the first statement was made he was under an illegal arrest, we think that fact does not require the rejection of evidence volunteered by him for reasons sufficient to himself and made without force or compulsion or promise of reward."

In the case of United States v. Walker, 2 Cir., 1952, 197 F.2d 287, 289, certiorari denied 344 U.S. 877, 73 S.Ct. 172, 97 L.Ed. 679, the court stated:

"The other item of evidence to the use of which the appellant objects is his confession. This was a voluntary confession. The fact that it was made while he was under illegal arrest does not make it incompetent. The rule of McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819, upon which the appellant relies is inapplicable to the case at bar."

This rule has been followed in a number of state cases.[4]

Morton v. United States, 1945, 79 U.S. App.D.C. 329, 147 F.2d 28, certiorari denied 324 U.S. 875, 65 S.Ct. 1015, 89 L.Ed. 1428, was an appeal from a conviction of second degree murder. The decedent was last seen with the appellant on a Saturday afternoon. Appellant was seen by a liquor dealer at nine o'clock the same night with blood on his clothing, and again at eleven o'clock that night with blood on his face and clothing. Decedent's badly beaten and nearly nude body was found the next morning in Rock Creek Park. Near the body a broken whisky bottle was found which was identical with and bore the same stamp number as the one that appellant had purchased from a liquor dealer who identified the appellant to the police before appellant was arrested. The police went to appellant's room without a warrant and placed him under arrest. Appellant

---

4. See, e. g., Ivey v. State, 4 Ga.App. 828, 62 S.E. 565; Hicks v. State, 213 Ind. 277, 11 N.E.2d 171, 12 N.E.2d 501; People v. Klyczek, 307 Ill. 150, 138 N.E. 275; State v. Westcott, 130 Iowa 1, 104 N.W.

341; State v. Raftery, 252 Mo. 72, 158 S.W. 585; Hendrickson v. State, 93 Okl.Cr. 379, 229 P.2d 196; Balbo v. People, 80 N.Y. 484.

testified that he did not permit the officer to search his room. Bloodstained clothing was taken 'from a closet, and a partly filled bottle of whisky and a newspaper were taken from a table in appellant's room. He admitted being with the decedent in the Park and that he had slapped her, but he denied killing her. The court held the admission of this evidence was proper.

In Brinegar v. United States, 10 Cir., 1947, 165 F.2d 512, 515, affirmed, 1949, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879, the court said:

" 'The mere questioning of a suspect while in the custody of police officers is not prohibited either as a matter of common law or due process.' [Quoting from Lyons v. Oklahoma, 322 U.S. 596, 601, 64 S.Ct. 1208, 1212, 88 L.Ed. 1481.] Neither will the fact that the arrest, under which the person was taken into custody, was illegal, in and of itself render a confession or an incriminating statement involuntary. The test is whether, under all the facts and circumstances, the confession or incriminating statement was voluntarily made."

■ We believe that neither the arrest nor subsequent search was illegal; but, without the necessity of holding that the arrest and search were proper, we believe that the admission of the inculpatory statement was proper, and that no reason exists for the reversal of the conviction on this account.

■ The search incidental to the arrest revealed various articles and money which formed a part of the arrest. We believe the District Court was in error in suppressing the marked five dollar bill and the other articles, and would have been well advised to have denied the motion to suppress under the circumstances of this case. That the court did not admit the articles and money certainly did not react to appellant's disadvantage. In fact, he was given greater consideration than, in our opinion, he need have been given.

■ But even if the arrest and search were illegal—which we hold they were not—there was no error, as claimed by appellant, in the action of the trial court in allowing the Government to have marked for identification the articles which the trial judge declined to receive in evidence. Until the case was ready for trial no request had been made to suppress the bottle or narcotics paraphernalia. At the trial the court advised appellant's counsel that although one motion had been made already, and it did not include these items, he would pass on their admissibility as the matter was reached in the trial. Adequate opportunity to move to suppress had been given prior to trial. No other way to obtain a ruling as to the admissibility of these additional items was open except to have them marked for identification and thereafter offered in evidence. This was done and they were excluded. No objection was made at the trial, nor was there any request that these items be kept out of the jury's sight. The trial judge instructed the jury that they were to disregard the items. Even if the items should have been suppressed, no error was committed.

We have examined the remaining assignment of error—that appellant was denied a speedy trial—and find no merit in this claim.

Affirmed.

BAZELON, Circuit Judge (dissenting).

The crucial evidence upon which appellant was convicted was his admission to the police that he had sold narcotics to Hayden. The police obtained the admission by questioning appellant in his dwelling [1] after they had illegally en-

---

1. That appellant had a residence at another place did not make the house the police entered any the less his dwelling. The friend who owned the house had already been absent about a month and was to be away for another month or two, during all of which time appellant was living and was to continue to live in the house.

tered it. **I** would reverse the conviction because the evidence, being the fruit of the illegal entry, should have been excluded. Nueslein v. District of Columbia, 1940, 73 App.D.C. 85, 115 F.2d 690.[2]

From the proposition that the common law authorizes a policeman to arrest a person on reasonable cause to believe he has committed a felony, the majority proceeds to the conclusion that the policeman may legally invade the person's home to make the arrest without a warrant of any kind. But that conclusion does not always follow. It does not follow in the circumstances of this case.

The common law seeks to interpose between the policeman and the suspect an impartial magistrate who shall decide whether there is probable cause to abridge the suspect's liberty by arresting him. It has always been held, however, that circumstances of necessity may justify arresting a suspect without a warrant. In the development of the common law of arrest the basic assumption was that arrests would generally be made on the basis of warrants, the warrantless arrest being the occasional exception.[3] In police practice, however, the exception has swallowed the rule. In recent years, most—almost all—arrests have been made without warrants.[4] The mere number of warrantless arrests, as compared with warranted ones, suggests that, in dispensing with warrants, the police are not depending upon exigent circumstances, but are rather arrogating to themselves the migistrates' function of determining whether there is probable cause to arrest. Since the law allows the police, as an incident to a lawful arrest, to search the arrested person and the place where the arrest is made,[5] there is temptation to dispense with warrants thereby obtaining maximum flexibility in picking the time and place of the arrest.

When the police use this do-it-yourself flexibility to arrest in his home a suspect whom they could have arrested earlier elsewhere, the law draws a line. It holds such an arrest and any search incident to it illegal. McKnight v. United States, 1950, 87 U.S.App.D.C. 151, 183 F.2d 977.

Where it does not appear that the police could have made the arrest earlier elsewhere, my brothers' present view would seem to be that an invasion of the suspect's home to make a warrantless arrest and search is valid, even absent any

2. See also the concurring opinion of Mr. Justice Jackson in McDonald v. United States, 1948, 335 U.S. 451, 459, 69 S.Ct. 191, 195, 93 L.Ed. 153:

"Having forced an entry without either a search warrant or an arrest warrant to justify it, the felonious character of their entry, it seems to me, followed every step of their journey inside the house and tainted its fruits with illegality."

And see Accarino v. United States, 1949, 85 U.S.App.D.C. 394, 403, 179 F.2d 456, 465, in which Judge Prettyman wrote:

" * * * the breaking of the door was unlawful, the presence of the officers in the apartment was unlawful, and so the arrest was unlawful. It follows that the search was unlawful and the evidence thus procured should have been suppressed."

3. Warner, Investigating the Law of Arrest, 26 A.B.A.J. 151, 152 (1940).

4. According to Warner, ibid., warrantless arrests constitute the "vast majori-

ty." Judge Yankwich cites a 1930 finding by the Committee on Criminal Law and Criminology of the American Bar Association "that, in the largest cities, at least ninety-five per cent of all arrests are made without warrant." Yankwich, Lawless Enforcement of Law, 9 So. Calif.L.Rev. 14, 17 (1935). See also Note, Philadelphia Police Practice and the Law of Arrest, 100 U.Pa.L.Rev. 1182, 1183 (1952): "Despite the ease with which warrants may be obtained, the Philadelphia police almost never use them. Of a total of 770 arrests examined by the writers only 24, or 3%, were authorized by warrants." But see Foote, Safeguards in the Law of Arrest, 52 Nw.U.L.Rev. 16, 20 (1957), pointing to the inadequacy of most police statistics and most research methods in this field and warning against "hasty generalizations from geographically limited samples."

5. Agnello v. United States, 1925, 269 U.S. 20, 30, 46 S.Ct. 4, 70 L.Ed. 145.

critical necessity to dispense with a warrant. But that view, I think, misconstrues the law. The law is as this court stated it in District of Columbia v. Little, 1949, 85 U.S.App.D.C. 242, 246, 178 F.2d 13, 17, 13 A.L.R.2d 954, affirmed on other grounds, 1950, 339 U.S. 1, 70 S.Ct. 468, 94 L.Ed. 599:

"* * * no matter who the officer is or what his mission, a government official cannot invade a private home, unless (1) a magistrate has authorized him to do so or (2) an immediate major crisis in the performance of duty affords neither time nor opportunity to apply to a magistrate."

The authorities cited to the court in Little, including Morton v. United States, 1945, 79 U.S.App.D.C. 329, 147 F.2d 28, which the majority relies on here, did not "support the proposition that an officer may enter any building if he has reasonable ground to believe that a person therein has committed a felony." 85 U.S.App.D.C. at page 246, 178 F.2d at page 17.

It is easy—perhaps too easy—to find in the common law authorities dicta seeming to establish a right of the police to invade a home without a warrant when there is reasonable cause to believe the occupant has committed a felony. But analysis of the authorities shows there is no such established police right. I have seen no more illuminating analysis of the common law authorities than that of Judge Prettyman, speaking for the court, in Accarino v. United States, 1949, 85 U.S.App.D.C. 394, 402, 403, 179 F.2d 456, 464, 465. His conclusions deserve restatement:

"It seems to us clear that from the early days of the common law the breaking of doors to make an arrest without a warrant was lawful *only if necessary*. [Emphasis supplied.] Indeed, there was grave doubt among the great authorities that an officer had any power to break doors without a warrant. Care should be taken nowadays that expressions of opinion by those early writers in support of the existence of the power are not misconstrued as assertions of an unqualified power. A man in his own home has a right of privacy which he does not have when on the public street. That additional right imposes additional requirements upon the power of arrest. [Here follows the above quotation from District of Columbia v. Little.]"

* * * * * *

"* * * Unless the necessities of the moment require that the officer break down a door, he cannot do so without a warrant; and if in reasonable contemplation there is opportunity to get a warrant, or the arrest could as well be made by some other method, the outer door to a dwelling cannot be broken to make an arrest without a warrant. The right to break open a door to make an arrest requires something more than the mere right to arrest. If nothing additional were required, a man's right of privacy in his home would be no more than his rights on the street; and the right to arrest without a warrant would be precisely the same as the right to arrest with a warrant. The law is otherwise.

* * * * * *

"Upon one topic there appears to be no dispute in the authorities. Before an officer can break open a door to a home, he must make known the cause of his demand for entry. There is no claim in the case at bar that the officers advised the suspect of the cause of their demand before they broke down the door. Upon that clear ground alone, the breaking of the door was unlawful, the presence of the officers in the apartment was unlawful, and so the arrest was unlawful. It follows that the search was unlawful and the evidence thus procured should have been suppressed."

Applying the Accarino principles to the instant case, the entry of the police into appellant's dwelling was unlawful if it was a "breaking" and either (1) was not required by "the necessities of the moment," or (2) the officers failed to make known the cause of their demand for entry. I find here all the conditions establishing illegality: *the entry was a "breaking"; it was not necessary; and the officers failed to make known the cause of their demand for entry.*

The majority opinion states that the officers "did not force their way" into the house. Appellant testified that the officers "bust in through the back door" and one of the officers characterized the entry as "a raid." At the very least, it appears from the record that their entry was not by invitation or by consent and that the door was not ajar for them. As the majority states, the officers turned the knob, opened the door and entered. Since it is well established that what constitutes breaking in the law of burglary also constitutes breaking in the law of arrest [6] and that turning a door-knob is a sufficient breaking for burglary,[7] the police entry of the house was a breaking.[8]

As for the necessity of breaking into the house without a warrant, the majority opinion notes that "the officers believed that by the time they could get a search warrant there would be no narcotics in the premises." Indeed, so one of the officers testified at the trial under questioning by the judge. Passing the question whether such belief would constitute the "immediate major crisis" which this court found necessary to justify a warrantless invasion of a home in Little,[9] I conclude from the record before us that the belief was not in fact

entertained or, at least, could not reasonably have been entertained. The trial judge asked the officer what evidence he had that appellant had any narcotics and the officer replied, "I knew that the special employee had went into the premises and made a purchase of narcotics." But the informer had been sent in to buy six capsules and had come out with three, informing the officers not only that appellant had told him he had no more, but also that he himself could see no more in the container from which appellant had produced the three capsules. The officers therefore had reason to believe there were no more narcotics in the house, and no reason to suppose the contrary. A belief that non-existent narcotics might disappear if they delayed breaking in, if they entertained such a belief, would have been altogether unreasonable and would not have justified invading the house without a warrant.

Moreover, the officer's testimony that the house was invaded without a warrant because of that belief has the earmarks of a manufactured afterthought. The reason for dispensing with a warrant had been expressed to the prosecutor when he interviewed the officers in preparation for trial. That reason was "that a buy had then been made from this defendant." The prosecutor, informing the court of this reason for breaking in without a warrant, characterized it as "what I understand in contemplation of law to be an insufficient reason * *." That is also my understanding.

Furthermore, apart from the reason given by the officers for breaking in without a warrant, there is nothing in the circumstances of the case to justify it. One of the officers could have gone for a warrant leaving the three others to guard

---

6. Wilgus, Arrest Without A Warrant, 22 Mich.L.Rev. 541, 673, 798 at 806 (1924), and authorities there cited; see also Boynton v. State, Fla.1953, 64 So.2d 536, 548.

7. Supra note 6; see also Clark and Marshall Crimes § 410 (1952).

8. Cf. Woods v. United States, 1956, 99 U.S.App.D.C. 351, 353, 240 F.2d 37, 39, certiorari denied, 1957, 353 U.S. 941, 77 S.Ct. 815, 1 L.Ed.2d 760, where pushing open a door with the back of an officer's hand was held to be a breaking.

9. 85 U.S.App.D.C. at page 246, 178 F.2d at page 17.

the two doors of the house to make sure no one escaped. The only evidence they had reason to believe was in the house was the marked five dollar bill with which Hayden had bought the three capsules. Since the occupants of the house were unaware of the impending incursion by the police, there was no reason to anticipate that this evidence would be destroyed.[10]

The common law requirement that, before breaking into a house without a warrant, the officer "must make known the cause of his demand for entry"[11] was ignored here just as in Accarino. As in that case, the police merely knocked on the door and announced that they were police officers, but it does not appear that they announced the cause of their demand before they broke in. Therefore, as in Accarino, their entry was illegal "[u]pon that clear ground alone * * *."[12]

Enough has been said, I think, to demonstrate that reasonable cause to believe an occupant of a house is guilty of a felony does not at common law authorize a police officer to break in to make an arrest without a warrant. I shall now show that no such authority is granted by the statutes relating to the law of arrest in the District of Columbia.[13]

The Metropolitan Police Department of the District of Columbia was established by an act of Congress in 1861,[14] amended in 1862.[15] The 1861 act provided in § 7 for a force to consist of a superintendent, ten sergeants and up to 150 patrolmen. By § 27, all the members of the force were required to take an oath of office; the superintendent and the sergeants were, in addition, to furnish security. Section 9 of the 1861 act specified the powers of the police. It provided:

"That the members of the said police force shall possess * * * all the common law and statutory powers of constables * * *;[16] and any warrant for search or arrest, issued by any magistrate of the said District of Columbia, may be executed * * * by any member of said police force * * * according to the terms thereof * * *.[17] *The superintendent of police and the sergeants of police, having just cause to suspect that any felony has been, or is being, or is about to be, committed within any building, * * * may enter upon the same at all hours of day or night, to take all necessary measures for the effectual prevention or detection of all felonies, and may take then and there into custody all persons suspected of being concerned in such felonies, and also may take charge of all property which he or they shall have then and there just cause to suspect has been stolen.*"[18] [Emphasis supplied.]

As I read this section, it was the intent of Congress that, although the members

---

10. See the dissenting opinion of Chief Judge Edgerton in Shepherd v. United States, 1956, 100 U.S.App.D.C. 302, 311, 244 F.2d 750, 759, certiorari granted sub nom. Miller v. United States, 1957, 353 U.S. 957, 77 S.Ct. 867, 1 L.Ed. 908.

11. Even if the officers have a search warrant, this requirement is imposed by statute. 18 U.S.C. § 3109; Woods v. United States, supra note 8.

12. 85 U.S.App.D.C. at page 403, 179 F.2d at page 465. See also Work v. United States, 1957, 100 U.S.App.D.C. 237, 238, 243 F.2d 660, 661; and the dissenting

Shepherd v. United States, supra note 10. opinion of Chief Judge Edgerton in

13. See United States v. Di Re, 1948, 332 U.S. 581, 589–591, 68 S.Ct. 222, 92 L.Ed. 210.

14. August 6, 1861, c. 62, 12 Stat. 320–26.

15. July 16, 1862, c. 181, 12 Stat. 578–82.

16. Now D.C.Code § 4–136.

17. Now D.C.Code § 4–138.

18. Now D.C.Code, § 4–141. As a result of subsequent reorganization the "sergeants" became "lieutenants."

of the force were to have the authority of a common law constable to arrest without warrant on reasonable cause to believe the suspect guilty of a felony,[19] only the eleven top officers, in whom special confidence was reposed, should have authority to invade a building to make an arrest.[20]

This reading of the 1861 act is reinforced by the 1862 amendment of the statute. Section 3 of the 1862 amendment granted power to the superintendent of police to authorize any member of the force to enter certain types of buildings for the purpose of arrest and seizure of property.[21] This section is limited, however, to gaming and lottery houses, houses of prostitution, and places for lewd and obscene entertainment; and the authorization to enter can be granted only upon a signed complaint by an officer or by two householders stating the grounds upon which the premises are believed to come within the limitations of the section. This section of the 1862 amendment defines the extent to which police officers may enter a house to arrest on reasonable cause.[22]

Respecting the general authority of police officers to arrest without warrant, § 10 of the 1862 amendment is specific. It provides that a member of the force may "immediately arrest without warrant * * * any person who shall commit, or threaten or attempt to commit, in the presence of such member, or within his view, any breach of the peace or offence directly prohibited by act of Congress [or by any law or ordinance in force in the District]."[23] Under this provision, they may arrest a person in his home without a warrant only if they happen to be on the premises lawfully,[24] or if, from the outside, they can see the crime being committed.[25]

The majority opinion seeks to bring the instant case within the authority of the last-quoted section by characterizing this crime as having been "committed in the presence of the officers" and analogizing it to Agnello v. United States, 1925, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145. Since the felony in this case consisted of selling narcotics to Hayden behind the closed doors of a dwelling-house and since the four Narcotics Squad officers were outside, with no possibility of sensory perception of what was transpiring in the house,[26] the felony was not committed in the presence of the officers,[27] unless Hayden is considered one of the officers. Throughout the majority opinion, Hayden is referred to as "a special employee of the Metropolitan Police Department." In his testimony he called himself a "special agent." As appears from the record, however, Hayden was under indictment for a crime at the time of these events and, five days later, was convicted. He was serving a sentence at Occoquan Reformatory at the time of his testimony. He had also had

19. Carroll v. Parry, 1919, 48 App.D.C. 453, 459.

20. As to the constitutionality of a statutory grant of authority to any police officer, no matter how exalted, to invade a home without a warrant from a magistrate or exigent circumstances justifying its omission, see District of Columbia v. Little, supra, 85 U.S.App.D.C. at page 248, 178 F.2d at page 19; see also discussion infra.

21. Now D.C.Code, § 4–145.

22. But see supra note 20.

23. Now D.C.Code, § 4–140.

24. See, e. g., United States v. Rabinowitz, 1950, 339 U.S. 56, 60, 70 S.Ct. 430, 433, 94 L.Ed. 653, where officers, having lawfully entered under a valid warrant of arrest, were held to have authority to arrest for a crime "being committed in their very presence."

25. Cf. Agnello v. United States, supra note 5; and United States v. Harnish, D.C.D.Me.1934, 7 F.Supp. 305, in both of which the officers observed the events in the house by looking through a window.

26. 4 Wharton, Criminal Law and Procedure § 1599 (1957).

27. Henderson v. United States, 4 Cir., 1926, 12 F.2d 528, 51 A.L.R. 420.

numerous other convictions, including one for a narcotics violation. His work as a "special agent" of the Metropolitan Police Department began "about the 26th of March," 1957, the day of appellant's arrest, and he was paid "by the case" rather than receiving a salary. This case was the only one he ever "worked on." In short, Hayden was an informer, not a policeman. However reliable the officers may have considered Hayden's information, the events were perceived by him, not by them. Plainly the crime was *not* committed in their presence.

Believing as I do that the police invasion of the house was not authorized either by common law or by statute, I would find it unnecessary to consider whether the invasion violated appellant's constitutional rights. But, since the majority reaches the constitutional question and decides it, I think, erroneously, I deem it advisable to state my views on that question.

In Wrightson v. United States, 1955, 95 U.S.App.D.C. 390, 393, 222 F.2d 556, 559, this court recognized the established principle that the Fourth Amendment covers arrests as well as searches.[28] We said:

> "The Amendment protects the people against the seizure of their persons as well as against the search of their houses."

So, having had no common law or statutory authority to invade appellant's house to arrest him, the officers here, as in Nueslein v. District of Columbia, 1940, 73 App.D.C. 85, 88, 115 F.2d 690, 693, "violated the security of the defendant under the IVth [Amendment] by unlawfully coming into his home and by placing him in custody."

The purpose of the Fourth Amendment, like that of the common law rule, is to assure, whenever possible, that the justification for breaking into a suspect's home shall be judged by a magistrate rather than a policeman. The Supreme Court said in McDonald v. United States, 1948, 335 U.S. 451, 455–456, 69 S.Ct. 191, 193, 93 L.Ed. 153:

> "Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals. Power is a heady thing; and history shows that the police acting on their own cannot be trusted.[29] And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home."

And in Johnson v. United States, 1948, 333 U.S. 10, 13–14, 68 S.Ct. 367, 369, 92 L.Ed. 436, the Court said:

> "The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enter-

28. The court cited Albrecht v. United States, 1927, 273 U.S. 1, 5, 47 S.Ct. 250, 71 L.Ed. 505, and McGrain v. Daugherty, 1927, 273 U.S. 135, 156, 47 S.Ct. 319, 71 L.Ed. 580.

29. Similar considerations, it may be noted, dictate the policy that arrested persons be brought before magistrates without unnecessary delay for a determination of whether there is probable cause to hold them. McNabb v. United States, 1943, 318 U.S. 332, 343–344, 63 S.Ct. 608, 87 L.Ed. 819; Mallory v. United States, 1957, 354 U.S. 449, 452–453, 77 S.Ct. 1356, 1 L.Ed.2d 1479.

prise of ferreting out crime. [Footnote omitted.] Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. [Footnote omitted.] Crime, even in the privacy of one's own quarters, is, of course, of grave concern to society, and the law allows such crime to be reached on proper showing. The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent."

Both in McDonald and in Johnson the Supreme Court noted that the Constitution does not prevent invasion of a home without a warrant in a "grave emergency" [30] or in "exceptional circumstances." [31] As Mr. Justice Jackson put it in his concurring opinion in McDonald:

"When an officer undertakes to act as his own magistrate, he ought to be in a position to justify it by pointing to some real immediate and serious consequences if he postponed action to get a warrant." [32]

As I have shown, supra, the consequence of postponing action which the majority refers to—that norcotics might disappear—is not "real" and, indeed, was not pointed to by the police as their reason for dispensing with a warrant. The reason they did point to—that they thought the fact that a buy had been made relieved them, as a matter of law, of the requirement of getting a warrant—is no justification at all.

My brothers of the majority say that, even if there were no exceptional circumstances justifying invading the house without a warrant of either arrest or search, United States v. Rabinowitz, 1950, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653, makes the invasion constitutional. I do not so read that case.

In Rabinowitz the police entered the defendant's establishment armed with a valid warrant of arrest. The question before the Court was whether, having had an opportunity to obtain a search warrant as well, the police could lawfully search the premises without a search warrant. There was thus no question about the lawfulness of the entry. The Court held that the lawful arrest supported a search without warrant. It did not hold that the police could make an entry without a warrant. In overruling Trupiano v. United States, 1948, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663, the Court made it clear that it was doing so only "[t]o the extent that [it] requires a search warrant based solely upon the basis of the practicability of pro-

---

30. 335 U.S. at page 455, 69 S.Ct. at page 193.

31. 333 U.S. at page 14, 68 S.Ct. at page 369. See also Work v. United States, supra note 12.

32. 335 U.S. at page 460, 69 S.Ct. at page 195. The theory that narcotics crimes are of a special heinousness justifying a degree of suspension of constitutional rights is untenable. Mr. Justice Jackson observed: "While I should be human enough to apply the letter of the law with some indulgence to officers acting to deal with threats or crimes of violence which endanger life or se-

curity, it is notable that few of the searches found by this Court to be unlawful dealt with that category of crime. Almost without exception, the overzeal was in suppressing acts not *malum in se* but only *malum prohibitum.* [Citing, inter alia, Johnson and Agnello, both narcotics cases.] While the enterprise of parting fools from their money by the 'numbers' lottery is one that ought to be suppressed, I do not think its suppression is more important to society than the security of the people against unreasonable searches and seizures." Id., 335 U.S. at pages 459–460, 69 S.Ct. at page 195.

curing it rather than upon the reasonableness of the search after a lawful arrest * * *." [33] 339 U.S. at page 66, 70 S.Ct. at page 435. The exact ambit of the Rabinowitz doctrine may be clarified by the Supreme Court in Jones v. United States, 5 Cir., 245 F.2d 32, certiorari granted, 1957, 355 U.S. 810, 78 S.Ct. 57, 2 L.Ed.2d 29.

In addition to his confession, the police obtained from appellant, as a result of their unlawful entry and the ensuing search, a "Bufferin" bottle. The informer testified that appellant had sold him the three capsules out of such a bottle. On cross-examination, the informer admitted that he had earlier told the police and the prosecutor that he was not sure appellant was the seller. He added that his earlier statement had been a lie and that his testimony that appellant was the man was really true. At the very least, it would seem, Hayden's testimony could stand some corroboration. For that purpose, the prosecutor had marked for identification the Bufferin bottle which the police had seized from appellant and asked Hayden whether it was the bottle from which the three capsules had come. Hayden said it looked like it. Then the prosecutor had one of the policemen identify the bottle as one that had been taken from appellant. If the Bufferin bottle was inadmissible in evidence because it had been illegally seized and if appellant's counsel fairly raised the question of its admissibility by timely objection, it was error to permit the prosecutor to question the witness about it. And if it was error, it could not fail to be prejudicial.

Since the invasion of the house without warrant of any kind and without exceptional circumstances justifying dispensing with a warrant was, as I have

shown, illegal, the arrest was illegal, the search was illegal and the seizure was illegal. Indeed, the trial judge so ruled at first, but then reversed himself. Even though he reversed himself on the question of legality of the seizure, however, he did not reverse his ruling excluding the bottle from evidence.

Before trial, appellant moved to suppress the marked five dollar bill which the police took from him. His motion did not refer to the narcotics paraphernalia which the police had found upstairs, because he did not claim to own them. At the hearing on the suppression motion, the prosecutor asked appellant whether a bottle had been taken from him and appellant said he did not recall that it had been. The court suppressed only the five dollar bill, all that appellant sought to have suppressed. At the trial, as soon as it appeared that the prosecution had a bottle which it claimed was taken from appellant at the time of the arrest, defense counsel moved that it too be suppressed. The court indicated that the motion was "too late," because not filed "prior to the trial," but counsel made the point that an arrested person cannot be expected to move to suppress an object until it appears that the police have seized it. The court took the motion under advisement. Ultimately, as I have said, he ruled that the bottle was inadmissible, but not before its full significance in the case had been impressed on the jurors' minds through the testimony of two witnesses.

When the prosecutor asked to have the Bufferin bottle marked for identification, defense counsel, already having moved to suppress it, said, "I am going to object." But the court, without ruling on the motion to suppress, allowed the bottle to be marked and exhibited to the wit-

---

33. In Trupiano the police had neither an arrest warrant nor a search warrant, but, since they saw one of the suspects operating the still through an open doorway, the entry and arrest were "valid on the theory that he was committing a felony in the discernible presence of an agent of the Alcohol Tax Unit, a peace officer of the United States." 334 U.S. at pages 704–705, 68 S.Ct. at page 1232.

nesses, indicating that an objection would be proper only when the bottle was being offered in evidence. The prosecutor, having obtained all the advantage he needed, never offered the bottle in evidence.

I think the defense motion to suppress the Bufferin bottle was timely and that it was error for the court not to rule on it, meanwhile permitting the prosecution to impress its full evidentiary force upon the jury. Normally motions to suppress evidence must be made before trial. But that rule obviously is inapplicable when the defendant does not know that the property in question has been seized. In such a case, the only reasonable rule is that the motion should be made as soon as possible after discovery of the seizure.[34] Had the police obtained a search warrant in this case, as they should have done, this problem would not be before us, for then, under the applicable statute, appellant would have known precisely what had been seized. D.C.Code, § 33–414 requires that the officer executing a search warrant give the person from whom property is seized a receipt listing every item taken. He must also file with his return of the warrant an inventory of all seized property, a copy of which inventory the owner may obtain upon request. It would seem the better practice for officers to give receipts for seized property even when the seizure is not pursuant to warrant. In the instant case, so far as appears from the record, there is no reason for appellant to have known that the police had taken an empty bottle from him until that fact was revealed at the trial.[35]

34. See Rule 41(e), Fed.R.Crim.P.; Gouled v. United States, 1921, 255 U.S. 298, 305, 41 S.Ct. 261, 65 L.Ed. 647; Price v. Johnston, 9 Cir., 125 F.2d 806, 808, certiorari denied 1942, 316 U.S. 677, 62 S. Ct. 1106, 86 L.Ed. 1750.

35. See the following colloquy at the trial:
"The Court: Did the officers give this defendant a list of the things they seized?
"Mr. Hantman [Assistant United States Attorney]: No, they didn't have any warrant.

"The Court: I know they didn't have a warrant, but don't they still have to give them a receipt for what they seize?
"Mr. Hantman: I don't know whether they did or not in this case.
"Mr. Fauntleroy [Defense Counsel]: I haven't seen any.
"Mr. Hantman: I dont know whether they did or not."